393

CORPORACION DE VENTAS DE SALITRE Y YODA DE CHILE, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 97315.    Promulgated May 6, 1941.

*George E. Cleary, Esq.*, for the petitioner.
*George R. Sherriff, Esq.*, for the respondent.

OPINION.

Van Fossan: The basic issue in the case at bar is whether or not the petitioner realized a gain or profit from the purchase of its own debentures at less than their face value. A negative decision of this question would automatically dispose of the case.

The petitioner contends primarily that it realized no income because it did not gain by the entire transaction, but only paid to debenture holders a part of its earnings. It fortifies its contention by three arguments:

1. The petitioner received no money or property upon the issue of its 5 percent debentures and hence the retirement of the debentures at a discount produced no gain.

2. The purchase of the debentures at a discount freed no assets because the petitioner's liability for payment was limited and conditioned.

3. The petitioner was insolvent both before and after the purchase. Thus no gain was realized.

If the petitioner's primary contention should not be sustained, it argues further that its income should not be taxed since it was not derived from sources within the United States and that the interest it paid on its American issue of debentures should be allowed as a deduction from any income realized by it from the purchase of its debentures at a discount.

The respondent controverts all of the petitioner's contentions.

The detailed historical facts and circumstances relating to the formation of the petitioner and to the specific issue of this case are set forth in our findings of fact. The facts essential to an understanding of the issue may be briefly summarized as follows:

On January 2, 1933, by presidential decree, Cosach was ordered liquidated. A liquidating commission proceeded to liquidate its affairs by returning the Lautaro and Anglo-Chilena stock to their former owners and by transferring the nitrate lands and plants to

Antofagasta. The only remaining assets of Cosach were stocks of nitrate and iodine on hand. Their value was offset by Cosach obligations equal to or exceeding it.

The petitioner was organized January 8, 1934, under Law 5350, whose peculiar features will be discussed later. Pursuant to that law a monopoly of the exportation of and trade in nitrate and iodine was granted to the petitioner, and the liquidating commissioner transferred the Cosach stocks of nitrate and iodine on hand to the petitioner, which assumed the obligations above mentioned. Law 5350 also required the petitioner to assume the service and amortization of Cosach 7 percent bonds for the account of the producers, but only of those bonds whose holders accepted the modifications established by the law and by future contracts with the trustees.

On October 31, 1934, the petitioner executed a trust indenture (a "future contract" contemplated by article 24 of Law 5350) securing its 5 percent debentures, to be exchanged for the Cosach 7 percent bonds and the temporary debentures. The terms of the indenture conformed to the limitations contained in Law 5350. The indenture permitted the petitioner to purchase its own 5 percent debentures out of a redemption fund authorized by that instrument. The 5 percent debentures were issued and all but $492,000 thereof were exchanged for Cosach 7 percent bonds.

During the taxable year the petitioner purchased its 5 percent debentures of the par value of $189,000 for $102,881.25 and was reimbursed therefor by the trustee out of the redemption fund.

The facts of the case at bar are unusual in many respects. Although the obligations purchased by the petitioner have been denominated "debentures" and are regarded as bonds, they possess peculiar features which, as to the petitioner, may impute a relationship wholly unlike that of the obligor of an instrument customarily considered a bond or indenture.

In the promissory clause of the debenture the petitioner promises to pay to the bearer or registered owner the principal sum of $1,000 and interest thereon at 5 percent. However, this promise is conditioned and limited later in the document to the proportion of the petitioner's consolidated net earnings available for debenture service, as defined in Law 5350. Thus the petitioner is under no obligation whatever to pay either the interest or the principal unless it has net earnings sufficient for that purpose. But the "adhering" companies are charged with the unconditional liability for such payment, upon default of the petitioner, its dissolution or the maturity of the debentures. Therefore, those companies are virtually the primary obligors of the debentures as to both principal and interest.

The obligation may be regarded as a joint and several one assumed

by the petitioner and the adhering companies but greatly restricted as to the petitioner. It may have been somewhat difficult to determine the precise amount of the petitioner's liability to pay the principal and interest of its debentures, yet the liability was real and monetarily measurable.

So also the monopoly granted by the Government of Chile was of great value. While the 25 percent of the net consolidated earnings was fixed as the current price of its enjoyment, it does not follow that it had no capital value. Many intangibles such as good will, contractual rights, equitable interests, etc., are valuable assets and are includible in their owner's financial statements. The omission of both of these items, the debentures and the monopoly, from the petitioner's balance sheets does not prove their nonexistence. They should have been included therein in order to arrive at the petitioner's true net worth. In view of their exclusion we can not say that the petitioner had no assets other than current stocks, etc., nor that it was insolvent.

The character of the petitioner itself is also anomalous. It was created as a selling agency for the producers, to control the production and to secure the sale of nitrate and iodine, to provide revenue for the Government, and to establish an orderly and healthy condition of the industry. Although given a corporate form and entity by Law 5350, it had no stockholders as such. No provision was made for the distribution of its assets upon liquidation.

If we should assume that the net liquidated assets, if any, would follow the 25–75 percent division of its net earnings, we would doubtless be met with the argument of the producers that the 25 percent was payable to the Chilean Government for nitrate and iodine currently produced and that, therefore, they would be entitled to any enhancement of capital value. But, regardless of the manner of the ultimate adjustment of that problem, it is obvious that the producers are the principal beneficiaries of the petitioner's profits. For practical purposes they correspond to stockholders of the petitioner corporation.

The petitioner was engaged in a highly profitable business. While its structure prevented its own enjoyment of its gains, yet they inured to the ultimate benefit of the adhering companies which used the petitioner as a means of deriving profit from the production of the commodities. Therefore, any tax upon the petitioner will fall upon the adhering companies where it properly belongs.

With these facts in mind we may proceed to a discussion of the petitioner's contentions. It first argues that it received no money or property upon the issuance of its 5 percent debentures, and hence received no gain upon the retirement of such debentures at a discount. We do not agree.

Cosach had been organized by Law 4863. It had issued its 7 percent bonds by authority of that law. It acquired the stock of the large competing companies and the assets, including nitrate lands, of some thirty smaller companies. It thus obtained control of practically the entire nitrate producing industry in Chile. In the early part of 1932 it needed additional working capital. Shortly thereafter it defaulted in its bond obligations. In January 1933 the president of Chile held that Cosach had been illegally organized and operated and ordered its liquidation. Law 5133 created a liquidating commission which took charge of Cosach's affairs. The commission proceeded to perform its duties.

In contemplation of the situation thus outlined, Law 5350 was enacted to restore the nitrate industry to a firm foundation. That law required the petitioner to assume certain debts of Cosach and the stocks of nitrate and iodine were transferred to the petitioner. The law also required the petitioner to assume "for the account of the producers" the service of Cosach 7 percent bonds and granted the monopoly heretofore described. Although the consummation of the various steps required to carry out these details occupied some time, such steps were all parts of the same reorganization plan.

· The petitioner maintains that it received neither money nor property upon the issuance of its debentures. The petitioner seems to regard the issuance of its debentures as a gratuitous act based on no valuable consideration. In our opinion that view of the matter is in error.

The petitioner was required to assume Cosach's liability on its bonds as a contemporaneous condition of its enjoying the government monopoly. Its own bonds were merely a substitution for the Cosach bonds, but they imposed a charge of only 5 percent as against the 7 percent payable formerly. Thus the petitioner was in a better financial position after the issuance of the debentures than before and had received a valuable right in addition to those acquired directly under Law 5350.

The petitioner further argues that no assets were freed from a liability to which they were theretofore subject. By the purchase under discussion the petitioner needed $86,118.75 less to extinguish its $189,000 worth of debentures than it would have required if they had been allowed to mature. To that extent, therefore, its other assets, including earnings from operations, were freed to contribute to the promotion of sales, the circulation of propaganda, and other activities which in turn would result in increased profits, all redounding to the benefit and advantage of the petitioner and, through it, of the producers.

The petitioner next maintains that it was at all times insolvent. This argument has been considered in the previous general discussion.

We need only to repeat that the petitioner has not proved that it was or is insolvent. The facts before us indicate quite the contrary. If the petitioner's position were correct we would behold this incongruous spectacle: Active and prosperous companies, owning practically all of Chile's nitrate and iodine producing lands worth millions of dollars; enjoying through the petitioner a monopoly in their industry; making a handsome yearly profit (over $5,000,000 in 1934 and over $9,000,000 in 1935), enough in fact to enable them to reduce their outstanding obligations by many thousands of dollars; and yet entrusting their entire sales and collections therefrom, aggregating about $20,000,000, to a hopelessly insolvent concern. We can follow neither the petitioner's reasoning nor its assumptions of fact in this respect.

Since we have decided adversely to the petitioner in its major contention, we must now consider its second point. The petitioner asserts that the income, if any, is not taxable, since it was derived from sources without the United States.

Petitioner argues that section 119 (a) of the Revenue Act of 1934 [1] specifies those classes of income which shall be treated as arising from sources within the United States and that, since the gain in question does not fall in any of those classes, it is not taxable. We considered this argument in *Zander & Cia, Ltd.*, 42 B. T. A. 50, and there held that the statute intended no exclusive enumeration of the types of taxable income from sources within the United States and that income primarily originating in this country is to be taxed without reference to the enumeration. *Hubert De Stuers*, 26 B. T. A. 201; *Carding Gill Ltd.*, 38 B. T. A. 669; and see *Helvering* v. *Suffolk Co., Ltd.*, 104 Fed. (2d) 505.

The petitioner further renews its contentions that it received no consideration for the original issuance of its debentures and that the

purchase thereof freed no assets. However, assuming that both points should be decided adversely (as they are), it argues that the Commissioner should have promulgated a regulation specifically applicable to the type of income here involved and that, in the absence of such a regulation, the income can not properly be regarded as income from United States sources.

In *Carding Gill Ltd., supra*, we observed that the petitioner overlooked the provisions of section 119 (e) of the Revenue Act of 1934,[2] and said:

It is true the statute contains no express reference to personal propery both purchased and sold within the United States. Gains therefrom, however, are obviously items of gross income, and are consequently to be treated, under specific legislative direction, by regulation. \* \* \* The applicable provision of Regulations 74 makes the place of sale the test; and it is conceded on petitioner's brief that the securities involved were sold in the United States. \* \* \*

The transaction which the respondent asserts gives rise to income was the petitioner's purchase of its own debentures. Their original value in the United States was no less than par. The debentures were exchanged for Cosach bonds in the United States and delivered here. The purchase was made in the United States from holders of the bonds in this country. The trustee was a New York trust company and provision was made in the trust indenture for service of notice in the United States. The trustee also canceled the debentures in the United States.

---

[2] (e) INCOME FROM SOURCES PARTLY WITHIN AND PARTLY WITHOUT UNITED STATES.— Items of gross income, expenses, losses and deductions, other than those specified in subsections (a) and (c) of this section, shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner with the approval of the Secretary. Where items of gross income are separately allocated to sources within the United States, there shall be deducted (for the purpose of computing the net income therefrom) the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of other expenses, losses or other deductions which can not definitely be allocated to some item or class of gross income. The remainder, if any, shall be included in full as net income from sources within the United States. In the case of gross income derived from sources partly within and partly without the United States, the net income may first be computed by deducting the expenses, losses, or other deductions apportioned or allocated thereto and a ratable part of any expenses, losses. or other deductions which can not definitely be allocated to some items or class of gross income; and the portion of such net income attributable to sources within the United States may be determined by processes or formulas of general apportionment prescribed by the Commissioner with the approval of the Secretary. Gains, profits, and income from—

    (1) transportation or other services rendered partly within and partly without the United States, or

    (2) from the sale of personal property produced (in whole or in part) by the taxpayer within and sold without the United States, or produced (in whole or in part) by the taxpayer without and sold within the United States,

shall be treated as derived partly from sources within and partly from sources without the United States. Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold, except that gains, profits, and income derived from the purchase of personal property within the United States and its sale within a possession of the United States or from the purchase of personal property within a possession of the United States and its sale within the United States shall be treated as derived partly from sources within and partly from sources without the United States.

In the face of these facts it is obvious that the petitioner's contention can not be sustained. We find no statutory exemption anywhere excluding from income gain derived from the petitioner's purchase of its own debentures. (See I. T. 3119, 1937–2, C. B. 227.) Therefore, the familiar principles established in the *Kirby Lumber Co.* case (*United States* v. *Kirby Lumber Co.*, 284 U. S. 1) control the taxation of the gain. See also *Helvering* v. *American Chicle Co.*, 291 U. S. 426, in which the bonds were those of a predecessor and had been assumed by the taxpayer. *B. F. Avery & Sons, Inc.*, 26 B. T. A. 1393; *Montana, Wyoming & Southern Railroad Co.*, 31 B. T. A. 62.

The petitioner's final contention is that the interest accrued and paid by it on its American issue of debentures should be allowed as a deduction from any income realized by it from sources within the United States through its purchase of its American debentures.

The statute governing the deduction is section 232 of the Revenue Act of 1934.[3] It limits the deductions allowed to a foreign corporation to those "connected" with income from sources within the United States. The income in the case at bar from such a source is the gain derived from the petitioner's purchase of its own debentures at a discount. That was the only transaction consummated during the taxable year by the petitioner in this country.

Funk & Wagnalls New Standard Dictionary defines the word "connect" as meaning:

(1) To join together as by links or fastenings; unite or combine in any way; bring into correlation; associate.

(2) To unite or join; be in close relation; be associated.

I. T. 2792, XIII–1, C. B. 85, states:

* * * To be allowable, therefore, the deduction must be "connected" with income from sources within the United States. The word "connected" means "joined or linked together by some tie, as of causality, relationship, or intimacy." The meaning at once suggested is that the requisite tie between the deduction and the income is that of causality, that is, that the expenditure for which the deduction is claimed must enter into, and be directly related to, the production of the income.

The purchase under discussion was an isolated transaction unassociated with the payment or accrual of current interest charges. The payment of interest was required by the trust indenture and had to be made in any event. It bore no relation to the purchase and did not contribute to the realization of the petitioner's income. The

---

[3] SEC. 232. DEDUCTIONS.

In the case of a foreign corporation the deductions shall be allowed only if and to the extent that they are connected with income from sources within the United States; and the proper apportionment and allocation of the deductions with respect to sources within and without the United States shall be determined as provided in section 119, under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

interest accrued by the petitioner was not "connected" with or related to the purchase of the debentures and hence is not deductible.

The position which we took in *Royal Insurance Co., Ltd.*, 38 B. T. A. 955, is not in conflict with our conclusion here. In that case we held that the limitation section 232 and its predecessors applied not only to depreciation, amortization, and depletion, but also to other deductions, such as losses, which were actually "connected with income arising from a source within the United States."

The reference to the legislative history there made is also appropriate to the situation here. The Report of the Senate Finance Committee relating to the Revenue Act of 1918 states (p. 8) :

In the case of nonresident alien individuals and foreign corporations, expenses, losses, debts, depreciation, amortization, and depletion are, under the language of the House bill, allowed only to the extent that they are connected with a trade or business carried on within the United States, and the depreciation, amortization, and depletion deductions are allowed only with respect to property within the United States. In many cases, however, property outside of the United States is directly concerned in the production of income taxable in the United States. Accordingly, the limitation with respect to nonresident aliens and foreign corporations has been modified so that the specified deductions shall be allowed *to the extent* that they are *connected* with income arising from a source within the United States (sec. 214 (b) and sec. 234 (b)). [Emphasis supplied.]

Thus, in view of our decision that the interest was not connected with the purchase, the amount of the interest is not deductible within the purview of the statute. Cf. *Stockholm Enskilda Bank*, 40 B. T. A. 107.

*Decision will be entered for the respondent.*