## CORPORACION DE VENTAS DE SALITRE Y YODA DE CHILE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 115.

Circuit Court of Appeals, Second Circuit.

July 17, 1942.

George E. Cleary, of New York City, for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Morton K. Rothschild, Sp. Assts. to the Atty. Gen., for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The question presented is whether a Chilean corporation realized taxable income by purchasing in the United States some of its own debenture bonds at less than their face value. The taxpayer contends, first, that the unusual circumstances under which its debentures were issued, and the limitations upon liability which they contained precluded its realization of gain by their purchase; second, that if gain was realized, it was not "income from sources within the United States," which alone is taxable under section 231 of the

Revenue Act of 1934, 26 U.S.C.A. Int.Rev. Acts, page 737; and third, in any event it was entitled by section 232, 26 U.S.C.A. Int.Rev.Acts, page 738, to set off against such gain a like amount of accrued interest paid in the United States on its outstanding debentures. All three contentions were decided by the Board adversely to the taxpayer.

The case was tried upon stipulated facts which the Board summarized in its opinion so far as it considered them material. They are very complex and so unusual that our decision can be of little interest except to the immediate parties to the litigation. Therefore our discussion will for the most part assume familiarity with the facts and a brief statement will suffice for this opinion.

The taxpayer was created in 1934 by Law 5350 of the Republic of Chile. It was granted a monopoly for a period not exceeding 35 years of the exportation of and trade in nitrate and iodine in Chile. Its principal office is in Santiago; it has never maintained an office or place of business in the United States. Its books are kept and its tax returns filed on the accrual basis of accounting, and its fiscal year ends June 30th. Prior to the creation of the taxpayer the nitrate industry in Chile had been in the control of another Chilean corporation known as Cosach. In 1933 a presidential decree declared that Cosach had been illegally organized and operated and ordered its liquidation by commission. A moratorium against the collection of its bonds and other obligations was also established. Pursuant to Law 5350, under which the taxpayer was organized, the liquidation commission returned to the former shareholders of Anglo-Chilena and Lautaro, the two principal producers of nitrate in Chile, the capital stock which Cosach had acquired and transferred to a corporation called Antofagasta the nitrate lands and other assets acquired from some thirty "independent" producers. They and their creditors received the shares and securities of Antofagasta. This disposed of all the assets of Cosach except the stocks of nitrate and iodine on hand as of June 30, 1933. These were transferred to the taxpayer upon its organization in January 1934. Exclusive of its bond issues hereafter to be mentioned, the obligations of Cosach which the taxpayer was obliged to assume under Law 5350 equalled or exceeded the value of such nitrate and iodine stocks. Cosach had outstanding an American issue of 7 per cent. bonds in the principal amount of some $38,000,000 and a British issue in the principal amount of some £2,700,000. Law 5350 authorized the taxpayer to issue its 5 per cent. debentures in exchange for Cosach 7 per cent. bonds which were then to be cancelled. All but $492,000 of the American issue were so exchanged. The taxpayer's dollar debentures were issued under an indenture to the Guaranty Trust Company of New York as trustee. The liability of the taxpayer was strictly limited by the provisions of Law 5350. Thus it was under no obligation to pay either interest or principal of the debentures unless it had net earnings sufficient for that purpose. By the provisions of Law 5350 its net earnings were to be used as follows: 25% to the Chilean Government as the price of the granted monopoly; out of the remaining 75% a sum equal to 6 per cent. on the exchanged Cosach bonds was to be devoted to interest on and amortization of the debentures, and a like sum paid to the producers; then 30% of the balance, if any, was to be devoted to "extraordinary amortization" and 70% paid to the producers. Upon dissolution of the taxpayer or upon maturity of the debentures and default by the taxpayer, unconditional liability for principal and interest thereof was assumed by Cosach in liquidation, Anglo-Chilena, Lautaro and Antofagasta, the three last named corporations having "adhered" to the taxpayer pursuant to Article IV of Law 5350 early in 1934. The trust indenture provided that the debentures might be redeemed at specified premiums and that after the deposit of redemption funds with the trustee, the taxpayer might purchase debentures on the market and obtain from the trustee reimbursement for their cost. During the taxable year in suit the taxpayer purchased in the United States debentures of the face value of $189,000 for $102,881.25 and was reimbursed therefor by the trustee out of the redemption fund. The commissioner determined that the difference of $86,118.75 constituted income to the taxpayer from sources within the United States; accordingly he assessed the deficiency in dispute. See Art. 22(a)-18, Treas.Reg. 86.

It is authoritatively established that a corporation may realize taxable income when it purchases its own bonds at less than the price at which they were issued.

United States v. Kirby Lumber Co., 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131. This is likewise true where the bonds bought at a discount were issued by another and assumed by the taxpayer in connection with the purchase of the other's assets. Helvering v. American Chicle Co., 291 U.S. 426, 54 S.Ct. 460, 78 L.Ed. 891. These cases go upon the theory that when a corporation received more upon creating a debt than it pays to retire it, the extinction of the debt frees to the debtor's general use assets previously allocable to satisfaction of the indebtedness; as suggested in the American Chicle opinion at page 431 of 291 U.S., at page 461 of 54 S.Ct., there is "a decrease of liabilities with corresponding increase of net assets"; hence a taxable gain. See Commissioner v. Coastwise Transp. Corp., 1 Cir., 71 F.2d 104, certiorari denied 293 U.S. 595, 55 S. Ct. 110, 79 L.Ed. 689; compare Commissioner v. Rail Joint Co., 2 Cir., 61 F.2d 751.

The taxpayer contends that the Kirby principle is inapplicable to the case at bar because (1) it received no money or property as consideration for issuance of its debentures, and (2) extinguishment of the debentures did not free its assets from a fixed liability to which they were theretofore subject, since its obligation was wholly contingent upon future earnings. As to the first objection, the Board held that the issuance of the debentures was not gratuitous; it treated the monopoly granted to the taxpayer as consideration for its debentures, as well as for its annual payments to the government, and found that the monopoly had "great value" as demonstrated by the taxpayer's profits of $5,-000,000 in 1934 and $9,000,000 in 1935. There was no finding, however, as to the amount of its value. Whether the Board's decision could be sustained without a finding that the monopoly was worth as much as the face of the taxpayer's debentures, some $50,000,000, is perhaps doubtful. But without decision of that question we shall pass to the taxpayer's second objection, based on the contingent nature of its liability.

 If the cancellation of indebtedness results in income on the theory that thereby assets are freed for the debtor's general use, it appears self-evident that the obligation to be retired must be one which unconditionally subjects the obligor's assets to liability for the payment of a fixed amount. If A covenants under seal to pay B half of next year's business profits and later pays B $1,000 for release of the covenant, it is obviously impossible to tell immediately whether the transaction was profitable or the reverse. If next year's profits should be less than $2,000, A will have lost money by his purchase of the release; on the other hand, should the profits be large he will have gained, but how much cannot be known until next year's business has been concluded, although it might be possible to make an approximate estimate in advance based on past experience. Moreover, the release of A's covenant could not possibly free capital assets from a preexisting liability (as in the Kirby case) for the covenant created no charge upon his capital assets. Likewise is this true in the case at bar, since the debentures were payable only out of a certain percentage of profits, if earned. The Board treated this fact as immaterial; it measured the taxpayer's gain as though it were absolutely liable to pay the face value of each $1,000 debenture. Yet there was no finding that its future earnings would be sufficient to make such payment upon the maturity of the debentures in 1968 (or the earlier dissolution of the taxpayer); nor was there any evidence upon which such a finding could have been made. Whether the taxpayer made a profit or loss in buying up debentures at 45% discount from face value is as yet pure speculation. We are satisfied, therefore, that the decision cannot stand unless the liability of the parties who are unconditionally bound to pay the debentures, if the taxpayer does not, can be availed of by the government to support the tax.

The taxpayer is an unusual corporation in many respects; one is that it has no shareholders. The distribution of its profits is prescribed by the law of its creation and the beneficiaries of such profits as are not allocated to the Chilean Government and the "servicing" of the corporation's debentures are the "adhering" producers. Anglo-Chilena, Lautaro and Antofagasta have "adhered"; whether there are other adhering producers does not appear. For purposes of discussion let it be assumed that the three named are the only adherents and may be regarded as shareholders. The case then becomes one in which the corporation is contingently liable and its only shareholders are absolutely bound to pay the debentures, if it does not. In such a case, purchase by the corporation of its debentures frees assets of the shareholders

from the unconditional liability to which they were previously subject; among such assets are their interests in the corporation of whose property they are the real owners. To identify them with the corporation and collect the tax from it might perhaps do no injustice since it would be borne by them in proportion to their corporate interests. In Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, where the sole shareholder of a corporation sought to deduct a loss on a sale to the corporation, the court held that the corporation and the taxpayer need not be treated as separate entities, but "The Government may look at actualities and * * * may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute", 308 U.S. page 477, 60 S.Ct. 358. There the sole shareholder, who was the taxpayer, was not allowed to use the corporate fiction to defeat a tax. It does not necessarily follow that when the government elects to treat the corporation as a taxable entity, it may disregard the corporate fiction and tax the corporation on gains really realized by its shareholders individually. To do so would produce very different tax results; for example, the shareholders are taxable at different rates than the corporation, and at different rates among themselves depending upon surtax brackets. We know of no case which has allowed the tax officials to disregard the corporate fiction when they elect to assess the corporation as the taxpayer. But however this might be in the case of an ordinary corporation, we think the corporate analogy cannot justly be carried over to the taxpayer at bar. The relations of the "adhering" producers to their corporation are very different from those of ordinary shareholders. Their "dividends" from its profits bear no relation to their respective interests in the corporation's assets; in fact they have no interest in its assets other than its earnings, and their respective shares in earnings correspond to the amount of their sales quotas of nitrate and iodine. These may vary from year to year. Consequently if the corporation pays the tax its burden will not fall upon adherents (the "shareholders") in proportion to their interest in the corporate assets, as would be the case if ordinary shareholders were involved.

For the foregoing reasons we think the tax cannot be sustained, and it becomes unnecessary to consider the other contentions of the petitioner.

Order reversed.

L. HAND, Circuit Judge (dissenting).

There can be no doubt that somebody made a profit when the bonds were bought in at a discount; and I think that that profit it was made "from sources within the United States." § 119(a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 709. If a non-resident obligor makes a bond payable in this country, he must bring his funds into the country to pay it; if he buys it in at a discount, that may not relieve any of his assets then within the United States, but it does relieve him of the duty of bringing assets into the United States when the bond falls due. There seems to me to be no substantial difference between that and relieving assets already within the United States. It does not of course follow that the taxpayer at bar should be taxed as though this profit were its own, and I feel the force of my brothers' reasoning to the contrary. I assume—because the taxpayer has the burden of showing the contrary—that the only persons who had any interest in its assets were the four "adherents"—"Cosach in Liquidation," Antofagasta, Lautaro and Anglo-Chilena. The taxpayer's obligation, though it was in form to pay the principal and interest of the bonds, was so limited that the burden of it could not be appraised, and there is no basis for estimating its profit unless we may look to the assets and undertakings of the "adherents" and treat them and the taxpayer as one.

The relations between them were that the taxpayer collected the earnings, paid the royalty to the Chilean government and distributed the surplus to the four "adherents" in proportions which varied from year to year. It had promised to pay the bonds only to the extent of the earnings; but the "adherents" promised without limitation to pay them so far as the taxpayer did not; and that promise was joint and several. The situation therefore was that any payments made by the taxpayer relieved the "adherents'" general assets quite as much as though they paid themselves, and that the payments came out of earnings which would otherwise be distributed to them. But we can tell neither how the earnings would be distributed, nor how the eventual burden of the bonds would have been distributed, even though

that would be in the same proportion as the earnings were distributed. For this reason I do not see how any particular "adherent" could be taxed upon its aliquot part of the profit; and this is equally true if the proper distribution of the burden of the bonds among the "adherents" be in some other proportion than their share of the earnings. Thus, although the "adherents" are the proper persons to tax, it is impossible to tax them severally. It is, however, possible to tax them collectively, leaving the distribution of the burden to them. My brothers suggest that perhaps the sum of their several taxes is less than the tax against the taxpayer, but to this it seems to me a sufficient answer that they have not proved that that is so, and so far as I can see they could not do so. The only possible objection therefore is that the tax was laid upon the taxpayer and not against the "adherents" collectively. That seems to me to be merely matter of form; they were liable collectively; they held out the taxpayer to act for them collectively, and the consequences of taxing it in the end are the same as taxing them severally, which is impossible. I do not think that either the taxpayer or they have any just ground of complaint that the tax is collected in this, the only feasible way.