MAX KRONENBERG, PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 8656-72.     Filed June 17, 1975.

*Leslie R. Barth* and *Robert H. Horowitz,* for the petitioner.
*Jon T. Flask,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of
$98,344.76 in the petitioner's Federal income tax for the year
1967. Some concessions have been made; the issues remaining for
decision are: (1) Whether liquidating distributions received by
the petitioner after he became a nonresident alien are taxable
under section 877 of the Internal Revenue Code of 1954,[1]
relating to expatriation to avoid tax; (2) the fair market value of
a note distributed in the liquidation; and (3) whether expenses
incurred in moving to Switzerland are deductible under section
877(b)(2).

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so
found.

The petitioner, Max Kronenberg, had his legal residence in
Lucerne, Switzerland, at the time of filing his petition herein.
Mr. Kronenberg and his wife, Elfriede Kronenberg, filed a joint
Federal income tax return for the period January 1, 1967,
through February 21, 1967, with the Internal Revenue Service
Center, North Atlantic Region, Andover, Mass. Mr. Kronenberg
filed a nonresident alien Federal income tax return for the period
February 22, 1967, through December 31, 1967, with the Office
of International Operations, IRS. However, since the petitioner
was required to file an individual return for the entire calendar

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during
the year in issue.

year, the Commissioner treated the joint return filed by Mr. and Mrs. Kronenberg as her separate return and the return filed by Mr. Kronenberg as his individual return for the entire calendar year, including therein items previously reported on the joint return.

Mr. Kronenberg was born in Switzerland in 1922. He immigrated to the United States in 1949 to seek employment in the mica importing business, which he subsequently obtained. He became a naturalized American citizen in 1955, but retained his Swiss citizenship. Mr. Kronenberg married twice; both wives were native-born Swiss citizens. His second marriage, in 1962, was to Elfriede Kronenberg, who had immigrated to the U.S. in 1959, and whom he had met at a Swiss Society social event. Mr. Kronenberg had two sons, Anthony, born in 1958, and Peter, born in 1962.

In 1955, Mr. Kronenberg organized a mica importing business. He incorporated it as Polymica & Insulation Co., Inc. (PIC), on January 5, 1960, under the laws of the State of Connecticut. In 1966, PIC's outstanding capital stock was held as follows:

|  | Number of shares | Percentage of ownership |
|---|---|---|
| Max Kronenberg | 4,765 | 95.30 |
| Elfriede Kronenberg | 1 | .02 |
| Anthony Kronenberg | 200 | 4.00 |
| Peter Kronenberg | 34 | .68 |
| Total | 5,000 | 100.00 |

Mr. Kronenberg was the president of PIC, and he and Mrs. Kronenberg were its sole directors throughout 1966 and 1967, until it was liquidated. Mr. Kronenberg was the sole officer of PIC, and he alone managed all of its affairs. He incorporated PIC and prepared all its tax returns, without assistance from attorneys or accountants.

In 1966, Mr. Kronenberg decided to sell the mica importing business to James W. Marshall, and on January 26, 1966, they entered into an executory contract for the sale of substantially all of PIC's assets to Mr. Marshall. Pursuant to the executory contract, PIC sold Mr. Marshall its business and intangible assets, its office furniture and equipment, and its inventory of mica as of the date the agreement was closed, but retained its accounts receivable. Mr. Marshall agreed to form a corporation to take over PIC's business and carry out the executory contract.

The executory contract also provided that Mr. Marshall was to employ Mr. Kronenberg in the new business. The performance of such employment by Mr. Kronenberg, was a condition of Mr. Marshall's obligations under the executory contract. On January 26, 1966, Mr. Kronenberg entered into an employment agreement with P & I Co., Inc. (P & I), the corporation Mr. Marshall formed to take over PIC's business. Mr. Kronenberg was employed as P & I's sales and purchasing manager for a term of 5 years, commencing March 1, 1966. He agreed to reside within the United States from March 1, 1966, to April 30, 1967. During such period, he taught Mr. Marshall about the mica importing business, particularly its financial management, and introduced PIC's customers to Mr. Marshall. After April 30, 1967, Mr. Kronenberg was required to work in Western Europe and live where he could most conveniently perform his duties.

On February 26, 1966, PIC's shareholders voted to adopt a plan of complete liquidation, under which its liquidation was to be completed by February 25, 1967. A timely election to liquidate PIC in accordance with section 337 was filed with the Commissioner. Pursuant to the plan, PIC was named and acted as its own liquidating agent. As of the date the plan was adopted, PIC ceased any business activity, except for paying debts and collecting accounts receivable. As of January 1, 1966, PIC's accounts receivable amounted to approximately $115,000. By February 25, 1967, all but $6,578.52 of them had been collected. As they were collected, Mr. Kronenberg invested the proceeds in an account he maintained in the name of PIC with a stock brokerage firm. The assets in the account consisted of cash and marketable securities and constituted substantially all of PIC's liquid assets. All of the securities had been purchased at Mr. Kronenberg's direction. The value of the assets was about $100,000 to $200,000 as of January 1, 1966; on February 24, 1967, their value was $545,137.

As of January 1966, Mr. Kronenberg intended to return to Switzerland to establish his residence there after April 30, 1967, in accordance with the employment agreement. However, he became doubtful as to whether he could carry out such plan; he was unsure whether Mr. Marshall could carry out his obligations under the contract. Mr. Marshall was in poor health and appeared not to have sufficient financial resources to operate the business on the same scope as Mr. Kronenberg. Throughout 1966, Mr.

Kronenberg assisted Mr. Marshall in honoring his commitments, and eventually, some of Mr. Kronenberg's doubts were resolved.

In December 1966, Mr. Kronenberg was informed by his accountants that if he lost his U.S. citizenship prior to receiving the PIC distributions, they would not be subject to taxation by the United States. In the following month, Mr. Kronenberg definitely decided to move to Switzerland, and in January and February 1967, he made final preparations for departure. He sold the family's house, purchased airline tickets, and made arrangements for transporting the family's possessions. He also engaged attorneys to prepare the formal legal papers needed to wind up PIC's corporate affairs.

PIC's shareholders adopted a certificate of dissolution on February 20, 1967, which was filed that day with the secretary of state of Connecticut. Mr. Kronenberg instructed his attorneys to arrange for the transfer of the assets in PIC's account at the stock brokerage firm to his personal account, but not to do so until the latest possible time. The transfer took place on February 24, 1967.

The distributions in liquidation also included the remaining accounts receivable and a note PIC received from P & I on February 28, 1966. The note was nonnegotiable and was payable only from the proceeds of sales of certain inventory items. It provided for the payment of no interest, and no date was set for the payment of the principal. P & I had the option of returning unsold inventory to PIC to be credited against the unpaid principal 1 year after the note was executed. The original face amount of the note was $49,070.79; $29,937.44 remained unpaid at the time of its distribution. On May 31, 1968, Mr. Kronenberg assigned a value of $32,679.36 to the note in a letter he wrote to the IRS concerning the final Federal income tax return of PIC. Later payments on the note were made, but $12,000 was never paid. When distributed, the note had a fair market value of $20,679.36.

Mr. Kronenberg and his family left the United States on February 21, 1967, and arrived in Zurich, Switzerland, the next day. Mr. and Mrs. Kronenberg voluntarily renounced their U.S. citizenships before the U.S. Consul in Zurich on February 23, 1967. Mr. Kronenberg intended to reside permanently in Switzerland and perform all the duties of a Swiss citizen. Since then, Mr. and Mrs. Kronenberg have resided in Lucerne,

Switzerland. Mr. Kronenberg performed services in Europe for P & I and did not report the compensation he received from P & I for U.S. income tax purposes.

Mr. Kronenberg did not report the distributions in liquidation of PIC on either of the U.S. income tax returns he filed for 1967. In his notice of deficiency, the Commissioner determined that the distributions were taxable and that the value of the P & I note was $32,679.36; he also made various other adjustments. In his petition, the petitioner, in addition to disputing the adjustments made by the Commissioner, claimed that he was entitled to deduct the expenses of moving his family to Switzerland and that he was therefore due an overpayment.

OPINION

The principal issue to be decided is whether the distributions from PIC are subject to income taxation by the United States. This issue involves sections 871(a)(2) and 877, which were added to the Internal Revenue Code by the Foreign Investors Tax Act of 1966 (FITA), 80 Stat. 1547, 1551-1552. In pertinent part, section 871(a)(2) provides:

In the case of a nonresident alien individual present in the United States for a period or periods aggregating 183 days or more during the taxable year, there is hereby imposed for such year a tax of 30 percent of the amount by which his gains, derived from sources within the United States, from the sale or exchange at any time during such year of capital assets exceed his losses, allocable to sources within the United States, from the sale or exchange at any time during such year of capital assets. * * *

The general rule of section 877 is contained in section 877(a), which provides:

(a) IN GENERAL.—Every nonresident alien individual who at any time after March 8, 1965, and within the 10-year period immediately preceding the close of the taxable year lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes under this subtitle or subtitle B, shall be taxable for such taxable year in the manner provided in subsection (b) if the tax imposed pursuant to such subsection exceeds the tax which, without regard to this section, is imposed pursuant to section 871.

As in effect in 1967, section 877(b) provided that a nonresident alien individual described in section 877(a) was in general taxable on his income under section 1 or 1201, with certain exceptions and limitations set forth therein.

The petitioner contended that his gains on the PIC distributions are excluded from tax under section 871(a)(2) because he was not present within the United States for 183 days or more during the taxable year 1967. The Commissioner has taken the position that section 871(a)(2) is not applicable, but that section 877 is controlling because the petitioner had been a U.S. citizen and one of his principal purposes for losing such citizenship was to avoid U.S. income taxes. Thus, the controversy revolves around the question whether Mr. Kronenberg did have such purpose when he lost his U.S. citizenship.

FITA was enacted "to provide more equitable tax treatment for foreign investment in the United States." H. Rept. No. 1450, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 967. It was also intended to furnish "increased incentives for investments by * * * [nonresident aliens and foreign corporations] in the United States." S. Rept. No. 1707, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 1059, 1064. To achieve such objective, certain areas of the existing law were restructured, including particularly the tax treatment of fixed or determinable income and capital gains from sources within the United States not effectively connected with the conduct of a trade or business within the United States. H. Rept. No. 1450, *supra,* 1966-2 C.B. at 978.

Under prior law, all the U.S. source income of a nonresident alien engaged in a trade or business within the United States was taxed at regular rates. H. Rept. No. 1450, *supra,* 1966-2 C.B. at 979. Unless lower treaty rates were applicable, fixed or determinable U.S. source income of a nonresident alien not engaged in a U.S. trade or business was taxed at a flat 30-percent rate, but if such income exceeded $21,200, it was taxed at the regular rates if the regular rates produced a greater tax than the flat 30-percent rate. A capital gain of a nonresident alien individual was subject to tax if he was physically present in the United States when the gain was realized, but if he was within the United States for 90 days or more during the taxable year, all his capital gains from U.S. sources were taxable regardless of whether he was in the United States when they were realized. The rate of tax applicable to such gains also depended on the amount of income for the year. It was perceived that such provisions were "unnecessarily complicated" and arbitrary. H. Rept. No. 1450, *supra,* 1966-2 C.B. at 979.

Under the new provisions, a flat rate of tax is imposed on the U.S. source fixed or determinable income of a nonresident alien, regardless of the amount thereof, which is not effectively connected with a U.S. trade or business. Sec. 871(a)(1). Under the new provisions, capital gains from U.S. sources are not taxable if a nonresident alien is present within the United States for less than 183 days during the taxable year. Sec. 871(a)(2). Elimination of progressive rates on large amounts of U.S. source income raised the apprehension that some U.S. citizens might thereby have an incentive to renounce their citizenship and move abroad. Such persons would "avoid the graduated tax rates on * * * U.S. investment income." H. Rept. No. 1450, *supra,* 1966-2 C.B. at 982. Section 877 was enacted to forestall tax-motivated expatriation. In general, it deprives a person who expatriates for such reason the tax advantages available to nonresident aliens for 10 years following expatriation.

When we examine the evidence, we are satisfied that in January 1966, Mr. Kronenberg wished to return to Switzerland and planned to do so sometime after April 1967. The employment contract which he made with P & I indicates that at that time, he expected to return to Switzerland after April 1967. However, the evidence also shows that subsequently in 1966, he had some doubts about his ability to carry out his plan; he was unsure whether Mr. Marshall would be able to complete the purchase of the business. Moreover, even though he was considering returning to Switzerland, it does not necessarily follow that in 1966 he had any plan to renounce his U.S. citizenship. Although he had become a U.S. citizen, he had retained his Swiss citizenship, and the evidence fails to show that he gave any consideration to renouncing his U.S. citizenship prior to December 1966.

In December 1966, Mr. Kronenberg first learned of the tax advantage of renouncing his U.S. citizenship prior to his receipt of the distributions in liquidation of PIC. From the evidence, there is no indication that, prior to learning such information, he had finally made up his mind to return to Switzerland, or that he considered renouncing his U.S. citizenship. After learning of such tax advantage, he engaged in a flurry of activity: he engaged attorneys to prepare the papers and complete the liquidation of PIC; he sold the family house; he made all the necessary arrangements for the transportation of his family and possessions to

Switzerland; on February 20, 1967, the shareholders and directors of PIC met and took the necessary actions to complete the liquidation of the corporation; he instructed his attorneys to distribute to him all the assets of PIC at the latest possible time; he and his family actually left the United States on February 21, 1967, and arrived in Zurich on the following day; on February 23, 1967, he and his wife renounced their U.S. citizenship; and in accordance with his instructions, the transfer of funds from PIC to his personal account was carried out by his attorneys on February 24, 1967.

The timing of Mr. Kronenberg's activities in January and February of 1967 is too perfect to be unplanned. Although he may have had, at an earlier time, a desire to return to Switzerland, the conclusion is inescapable that his plans did not become definite until he learned of the tax advantage of renouncing his U.S. citizenship before receiving the liquidating distributions. Clearly, after acquiring such information, he accelerated the time of his return to Switzerland, and once he reached Switzerland, he renounced his U.S. citizenship almost immediately and 1 day before his attorneys effected the liquidating distributions. Mr. Kronenberg testified that when he returned to Switzerland, he renounced his U.S. citizenship because he believed that its retention would be inconsistent with his participation in the privileges and duties of a Swiss citizen. Yet, the evidence fails to show that he gave any consideration to renouncing his U.S. citizenship before he learned of the possible tax advantage of doing so, but when he learned of such advantage, he speedily arranged his affairs to attempt to take advantage of it. In the light of these facts, we are not convinced that he renounced his U.S. citizenship without any regard to the avoidance of U.S. taxes. In fact, we are compelled to conclude that at least one of his principal reasons for expatriation was to secure the tax advantage which he first learned about in December 1966. Consequently, we hold that section 877 is applicable to Mr. Kronenberg. In view of that conclusion, it is unnecessary for us to consider the Commissioner's alternative argument that Mr. Kronenberg constructively received the liquidating distributions while he was still a citizen of the United States.

The petitioner maintained that the legislative history demonstrates that section 877 was not intended to apply to him. His contention is based upon the articulated concern that citizens

might move abroad to avoid "graduated tax rates on" their "investment income." Accordingly, the petitioner concluded that section 877 garnered only those who sought to avoid taxes on regularly received income, and since the income involved in this case was generated from a single transaction, section 877 is not applicable. However, in our view, the petitioner's interpretation of section 877 is unwarrantedly restrictive. Section 877(a) is broadly worded and covers avoidance of all U.S. income, estate, and gift taxes. H. Rept. No. 1450, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 967, 982. It is indisputable that Congress intended to tax capital gains received by those who expatriated for tax purposes. Section 877(b) specifically provides that section 1201, which imposes the tax on capital gains, is applicable to the income of a person subject to the section. Furthermore, section 877(c) contains special U.S. source income rules to be applied to those persons, and one of those rules provides that such a person is taxable on the gain realized from the sale of stock of U.S. corporations, wherever the sale may take place. Sec. 877(c)(2). Moreover, had Congress wished to tax only the capital gains of nonresident aliens who were receiving investment income from U.S. sources, it could easily have written such a restriction in the statute, but it did not do so. Thus, the breadth of section 877 and the specific applicability of the source rule of section 877(c)(2) show that Congress intended a far broader coverage than merely of the expatriate who sought to reduce tax on recurring income, and intended also to reach the expatriate who sought to protect capital gains on corporate liquidations.

In his brief, the Commissioner argued that the special burden of proof rule provided in section 877(e) was applicable. However, he first raised such issue in his brief, and in any event, we need not decide which party has the burden of proof since our factual conclusions would be the same in either event.

The petitioner argued that the amount of the PIC distributions should be adjusted to include only the fair market value of the P & I note at the time of its distribution, which he claimed was $20,679.36. The Commissioner argued that at about the time of the distributions, the petitioner apparently considered the note to have a value higher than that amount, and that in effect, he is now attempting to reduce that value in the light of subsequent circumstances; namely, the failure to collect $12,000 of the note. The Commissioner's position is tantamount

to an assertion that the petitioner may only contest items in returns which were readjusted in a deficiency notice. However, it is well established that petitioners may allege, and try to show, errors in such items which were not so readjusted. *Vincent A. Marco,* 25 T.C. 544 (1955). Accordingly, the petitioner may attempt to show that the actual fair market value of the note at the time of its distribution was less than the amount reported by him in the 1968 letter to the IRS.

The note was nonnegotiable and unsecured; it made no provision for interest charges and did not compel payment by any date. It was payable only from the proceeds of sales of inventory, and there was no requirement that it be paid if the inventory were not sold. Thus, the terms of the note gave no assurance that it would be paid. *Jay A. Williams,* 28 T.C. 1000 (1957); *Edward J. Hudson,* 11 T.C. 1042 (1948), affd. per curiam 183 F. 2d 180 (5th Cir. 1950); compare *Robert W. Adams,* 58 T.C. 41 (1972). In addition, there was some doubt whether the business would be successful enough so that the note could be paid in full. The buyer's financial resources were limited, and there was some question whether he would be able to operate the business on the same scale as had the petitioner. The buyer was inexperienced in the mica importing business. Compare *Packard Cleveland Motor Co.,* 14 B.T.A. 118 (1928). Payments were made during the year the petitioner assisted the buyer in running the business, and for some time thereafter, but eventually payments ceased, and $12,000 was never paid. *Joseph Marcello, Jr.,* 43 T.C. 168 (1964), affd. on another issue 380 F. 2d 499 (5th Cir. 1967). These circumstances demonstrate that beyond doubt, the fair market value of the note at the time of its distribution was less than the amount remaining unpaid at that time. Taking into consideration all the evidence, we are convinced that the note was highly speculative, and we are satisfied that its fair market value at the time of its distribution did not exceed $20,679.36.

The last issue to be considered is whether the petitioner is entitled to deduct expenses incurred in moving himself, his family, and his possessions to Switzerland. Section 877(b)(2) provides that "the deductions shall be allowed if * * * they are connected with the gross income included under" section 877. The deductions are generally those provided for in subtitle A of the Internal Revenue Code of 1954, and include moving expenses under section 217(a). H. Rept. No. 1450, *supra,* 1966-2 C.B. at

1023. However, such expenses are deductible only if they are connected with gross income includable under section 877. The petitioner would have received the PIC distributions even if he had not moved to Switzerland. His moving expenses were not connected with any income from U.S. sources taxable under section 877, but were connected with the compensation he subsequently earned while living in Switzerland.[2] Cf. *Royal Insurance Co.*, 38 B.T.A. 955 (1938); *Corporacion de Ventas de Salitre y Yoda de Chile*, 44 B.T.A. 393 (1941), revd. on another ground 130 F. 2d 141 (2d Cir. 1942); compare *Sax Rohmer*, 14 T.C. 1467 (1950). Accordingly, we hold that such expenses are not deductible.

*Decision will be entered under Rule 155.*

---

[2] Both parties presented arguments concerning the applicability of sec. 911, which, in part, disallows deductions "allocable to or chargeable against" income of citizens working abroad exempt from taxation under such section. *Markus v. Commissioner,* 486 F. 2d 1314 (D.C. Cir. 1973), revg. without published opinion a Memorandum Opinion of this Court; *Hartung v. Commissioner,* 484 F. 2d 953 (9th Cir. 1973), revg. per curiam 55 T.C. 1 (1970). Since we are not concerned with sec. 911, but with sec. 877, we need not consider such arguments. Also, the petitioner claimed that such expenses were incurred while he was a U.S. citizen, but offered no evidence as to when they were paid.