Cecil B. Furstenberg, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 19977–80.     Filed November 26, 1984.

*Charles W. Hall*, *William S. Lee*, and *Stephen M. Feldhaus*, for the petitioners.
*David W. Johnson* and *Sheri A. Wilcox*, for the respondent.

Featherston, *Judge*: Respondent determined deficiencies in petitioner's Federal income taxes as set forth below:

| Year | Deficiency |
| --- | --- |
| 1975 | $595,017 |
| 1976 | 1,476,718 |
| 1977 | 3,207,600 |

After concessions, the issues for decision are as follows:
(1) Whether petitioner's loss of her U.S. citizenship on December 23, 1975, had as one of its principal purposes the

avoidance of U.S. taxes within the meaning of section 877(a);[1]

(2) Whether, even if we find that petitioner had tax avoidance as one of her principal purposes in expatriating, the French Tax Treaty, rather than section 877, governs the taxation of petitioner's capital gains and U.S.-source dividends and interest after the date of her expatriation; and

(3) In the alternative, for the year 1975, whether petitioner is taxable on distributions from two trusts at the graduated tax rates applicable to U.S. citizens, or at the lower flat French Tax Treaty rate of 15 percent. Resolution of this issue turns on: (a) Whether an accumulation distribution in the amount of $830,753.13 from the Testamentary Trust of petitioner's mother, Sarah Campbell Blaffer, a complex trust, although actually distributed before petitioner's expatriation, is includable in petitioner's income for the period after she became a nonresident alien; [2] and (b) whether petitioner was in constructive receipt before December 23, 1975, the date of her expatriation, of a distribution of distributable net income in the amount of $128,792.71 from the Cecil A. Blaffer Trust No. 1, a complex inter vivos trust.

## FINDINGS OF FACT

At the time she filed her petition in this case, petitioner resided at 34 Boulevard d'Italie, Monte Carlo, Monaco. During the years at issue, petitioner kept her books and records and filed her Federal income tax returns on a calendar year basis using the cash receipts and disbursements method of accounting under section 446(c)(1).

### Petitioner's Early Background

Petitioner was born on December 17, 1919, in Houston, TX. She is the daughter of Sarah Campbell Blaffer and Robert Lee

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

[2] The parties have stipulated an actual distribution to petitioner on Nov. 20, 1975, before petitioner's expatriation, from the testamentary trust in the amount of $995,724.76. Such distribution consisted of $164,971.63 in distributable net income and $830,753.13 in accumulated income. Petitioner concedes that the portion of the distribution consisting of distributable net income actually received before her expatriation is taxable at the normal graduated rates applicable to U.S. citizens; at issue here is only the portion consisting of the accumulation distribution.

Blaffer; her father was one of the founders of Humble Oil & Refining Co., the predecessor of Exxon Corp.

Petitioner's formal education began at Kincaid, a day school in Houston. She then went to the Ethel Walker School in Connecticut. During World War II, petitioner attended a French school for girls in New York where instruction was exclusively in French. She later studied languages and art at the University of Mexico.

Because of the financial success of her father, petitioner's family was able to travel a great deal. As a child, petitioner traveled extensively with her family, visiting Europe, and in particular, France.

Petitioner had a close relationship as a child with her governess, a Frenchwoman named "Suzanne Glemet," described by petitioner as a "second mother." She spent several summers in France at the family home of her governess in Charent, in the southwest part of France near Bordeaux.

Petitioner learned to speak French as her "first language," i.e., before she learned to speak English. She is so fluent in French, in fact, that she is taken for a French person when she speaks. In addition to English and French, petitioner also speaks Spanish and German.

### Petitioner's Marriages to E.J. Hudson and Richard J. Sheridan

On August 7, 1945, petitioner married E.J. Hudson (Hudson), a petroleum engineer. Petitioner and Hudson had two sons, Edward Joseph Hudson, Jr. (Joe Hudson), born June 8, 1948, and Robert Lee Blaffer Hudson (Lee Hudson), born April 4, 1951.

The Hudsons resided in Houston during their marriage. They did, however, take many trips to Europe and spent extended periods of time there, particularly in France, with their children. On one occasion, the Hudsons rented a home near Paris, and on two other occasions, they rented a home in the south of France.

Petitioner's sons were educated for the most part in the United States. Both children, however, attended school in Paris for 1 year and in the south of France for 1 year. Both of petitioner's sons learned French as children, and both became fluent in that language.

During her marriage to Hudson, petitioner continued to travel as extensively as she had as a child. Her travel was "not always to his [Hudson's] liking." Petitioner was divorced from Hudson on March 14, 1963. After her divorce from Hudson, petitioner continued to travel frequently to Europe, including France and some of the other countries.

On January 25, 1968, petitioner married Richard M. Sheridan (Sheridan), an international executive of Mobil Oil Corp., in Tokyo, Japan. Petitioner resided with Sheridan in Tokyo from January 1968 to June 1968; they moved to London in September 1968. When she moved to London, petitioner moved her china, silver, and heirlooms there from Houston.

As of the time of their move to London, Sheridan would have been eligible for retirement from Mobil in approximately 8 or 9 years. Petitioner owned some real estate in the south of France;[3] she discussed with Sheridan the possibility of their settling there permanently after his retirement. Initially, Sheridan agreed to such a plan, but during the course of their marriage, he changed his mind. Petitioner separated from Sheridan in the summer of 1970, and was divorced from him on November 29, 1971.

### Petitioner's Move to Paris

In August 1969, petitioner obtained an option for the purchase of an apartment in a building to be constructed at 33 Avenue Foch in Paris; she purchased the apartment in January 1970. When construction of the apartment was completed, petitioner moved in, taking her personal belongings from London. It is stipulated that petitioner was a resident of France from 1970 through 1977, the last year here in controversy.

Petitioner's apartment in Paris was staffed by domestic help who kept the apartment open regardless of whether petitioner was staying there or traveling. Petitioner kept an automobile in Paris and maintained a bank account there; she subscribed to a French newspaper. She attended the Anglican Church

---

[3]Petitioner owned a substantial portion of the stock of Societe Immobiliere Commerciale et Agricole (S.I.C.A.), a French corporation. S.I.C.A. was in the business of selling lots which it owned at St. Paul de Vence in the south of France. Petitioner planned for S.I.C.A. to sell all of its lots but one on which she and Sheridan would build a home and live.

located on Avenue George V. Petitioner was a resident member, during the years at issue, of the Polo Club in Paris and was also a Paris resident member of Le Cercle du 33 Avenue Foch, another social club.

By this time in her life, petitioner had a great many friends in France and other European countries; indeed, the majority of her close friends were in Europe. While living in Paris, petitioner pursued her interest in the art world, visiting many museums and attending art exhibits, openings, and auctions, both in Paris and elsewhere in Europe.[4] She attended music festivals in Bayreuth and Munich in West Germany; in Salzburg and Vienna in Austria; and in the south of France and Italy.

## Petitioner's Marriage to Prince Tassilo von Furstenberg

Petitioner first met Prince Tassilo von Furstenberg (Furstenberg) in Trieste, Italy, in 1961. When they met, petitioner was in the process of obtaining her divorce from Mr. Hudson. Furstenberg, who was living in Italy at the time, was married to Clara Agnelli (Agnelli), an Italian woman from whom he had been separated for years. At that time, however, divorces were prohibited under Italian law.

Petitioner spent time with Furstenberg in Trieste, where he escorted her to parties and introduced her to relatives and friends. They met again a few weeks later in Austria, during the music festival in Salzburg; petitioner accompanied Furstenberg to his nearby hunting lodge to meet relatives and friends. As early as their meetings in 1961, petitioner and Furstenberg found that they were compatible and congenial. They discussed the subject of marriage; however, neither of them was free to marry at that time.

During the period from 1961 to 1966, petitioner saw Furstenberg when she went to Europe and they corresponded frequently. After her divorce from Sheridan in 1971, petitioner saw Furstenberg in Paris, Salzburg, and Vienna in 1972, and

---

[4]As a child, petitioner was encouraged by her mother to study the fine arts; petitioner's mother made lifetime gifts to her of paintings by such artists as Matisse, Braque, and Picasso. Further, petitioner's corporation, Beekman Gallery Corp., which was operated by petitioner with an associate, had been engaged in the business of buying and selling art objects all over the world for approximately 20 years. The fact that petitioner lived in Europe was advantageous in her work for the corporation, because there were more art markets in Europe than in the United States.

they spent a great deal of time together. By the early 1970's, Italian law had been changed to permit divorces and Furstenberg was divorced from Agnelli.

Sometime during the first 3 months of 1975, petitioner and Furstenberg decided to marry. At that time, petitioner was 55 years of age, and Furstenberg was 71 years of age; petitioner's two sons and Furstenberg's three children were living independently of their parents. Although the prior marriages of petitioner and Furstenberg had been unsuccessful, they felt that they were compatible and that they "could make a success" of their marriage.

At the time of their decision to marry in 1975, petitioner was living in Paris, and Furstenberg was living most of the time in Italy. They discussed where they would make their home after the marriage and agreed to live for the time being in petitioner's apartment in Paris. With respect to where they might live later, they were both very partial to the south of France.

They also discussed the possibility of living in Austria. Furstenberg, an Austrian citizen, owned a hunting lodge surrounded by some 70 acres of land in the Austrian town of Strobl on St. Wolfgang Lake. The land and lodge were purchased by Furstenberg's father and were the last of the family properties owned by Furstenberg. Petitioner was not adverse to the idea of living in Austria; however, although Furstenberg was emotionally attached to the property in Strobl, it was not equipped for winter living and he did not like living in such cold weather.[5] Further, Furstenberg had been living outside of Austria for several years, and he decided that he preferred to live with petitioner in Paris for the time being.

Petitioner and Furstenberg were married in Paris on October 17, 1975, in a civil ceremony attended only by their children and a few close friends. A buffet luncheon reception was given after the wedding at the apartment of Baron and Baroness Hubert von Pantz, Austrian friends of the Furstenbergs, and was attended by approximately 150 persons, including Baron Otto Eiselberg, the Austrian Ambassador to France. The Ambassador, assuming that petitioner would adopt the

---

[5]Petitioner and Furstenberg did, however, visit the lodge and spend time there during the summer months. During July, August, and September 1975, they spent 4 to 6 weeks in Austria to visit Furstenberg's family and friends and spend time at the lodge.

Austrian citizenship of her new husband, assured petitioner that he could simplify naturalization procedures for her.

The Furstenbergs honeymooned in the United States from October 20, 1975, to December 19, 1975. While on their honeymoon, they visited New York, Houston, San Antonio, Dallas, and Victoria. They visited Furstenberg's son and grandchildren, and petitioner introduced her new husband to family and friends whom he had not previously met.

As of the time of trial, petitioner had been married to Furstenberg for more than 8 years. Petitioner and Fursten-berg plan at their deaths to be buried at the Furstenberg family burial plot in Strobl, Austria.

*Petitioner's Adoption of Austrian Citizenship*

Members of Furstenberg's family first became princes of the Holy Roman Empire in 1664. He was and is a citizen of Austria; his Austrian heritage and ties are very important to him. At the time they decided to marry in early 1975, Furstenberg explained to petitioner the importance of his Austrian heritage and expressed to her his desire that she adopt Austrian nationality.

Cognizant of the fact that "it was more or less expected of that type of European aristocracy," petitioner confirmed her decision with her commitment to Furstenberg that she would be "very proud to marry him, bear his name, his title, and his nationality." Although she had been living outside of the United States for some years, at no time did petitioner ever consider the possibility of adopting European citizenship until her engagement to Furstenberg.

Petitioner felt that part of bearing Furstenberg's name and title "was to be Austrian the way he wished it." Further, by 1975, petitioner had been living in Europe continuously for 7 years; she preferred living in Europe more than anywhere else. Finally, petitioner felt that by adopting Austrian citizen-ship, she "was going back to [her own] * * * European heritage and roots."[6] At the time petitioner agreed to adopt

---

[6]None of petitioner's great-grandparents was born in the United States. On her father's side of the family, petitioner had two German great-grandparents, a French Huguenot-Alsatian grandfa-ther, and an Austrian great-grandmother. Petitioner's maternal great-grandparents were all born in Scotland.

Furstenberg's Austrian nationality, in early 1975, when they decided to marry, she did not know that by so doing, she would lose her U.S. citizenship. Further, she did not know what the tax consequences of such an action would be.

During their honeymoon, Furstenberg reminded petitioner of her agreement to become an Austrian citizen. Petitioner told her husband that she would attend to the matter as soon as she could.

The Furstenbergs returned to Paris from their honeymoon in the United States on December 19, 1975. They had planned to go to Vicenza in northern Italy to spend Christmas Eve with one of petitioner's sons and his wife and one of Furstenberg's sons. Knowing that her husband wished her to adopt Austrian citizenship as soon as possible, petitioner went to the Austrian consulate in Paris to make her application for Austrian citizenship on December 23, 1975. In her words, she chose that date because—

It just happened to be an afternoon that I could get off, and I knew that my husband wanted me to do it before the end of the year. He had mentioned to do it as soon as possible, and we were leaving that night for Italy. And I happened * * * to have that time * * * to go down and make the application.

As he had promised at petitioner's wedding reception, the naturalization process was simplified for petitioner at the request of Baron Eiselberg, Austrian Ambassador to France. Petitioner obtained Austrian citizenship by naturalization on her own application on December 23, 1975; she thereby lost her U.S. citizenship on the same day under the provisions of section 349(a)(1) of the Immigration and Nationality Act of 1952, 66 Stat. 267.

*Petitioner's Discussions With Her Accountant*

During the 1970's, petitioner's U.S. tax returns were prepared by Arthur Young & Co., an accounting firm. The individual at Arthur Young with whom petitioner discussed her tax returns was Gordon S. Moore (Moore), who is now deceased. Petitioner's practice was to meet with Moore once a year to discuss her current year's tax return, although some years she may have met with Moore twice.

In late April or early May 1975, after her decision to marry Furstenberg and adopt his citizenship, petitioner met with Moore when she came to Houston to attend to her mother who was terminally ill. At their meeting, petitioner informed Moore that she intended to marry Furstenberg, adopt Austrian citizenship, and live with her husband in Paris. She asked Moore to advise her concerning the income tax consequences of her plans.

Moore informed petitioner at this meeting that her plan to marry and adopt Austrian nationality would "complicate" her taxes. He warned petitioner about French taxes, telling her that the French taxes could be very high, and that they were rising. Moore told petitioner that he would look into it for her. Petitioner and Moore did not discuss the two trust distributions which petitioner later received in 1975; nor did they discuss the possibility of any sale of securities.[7] Petitioner had no further discussions with Moore during 1975 after this meeting.

Petitioner's next meeting with Moore did not occur until March 1976, after her expatriation, when petitioner was in Houston for a trustees meeting of the Sarah Campbell Blaffer Foundation.[8] Moore advised petitioner that by adopting Austrian citizenship, she had put herself "in a position to be challenged by the tax authorities in the United States." In addition, she had exposed herself to "double taxation with the French and the Americans." Petitioner did not understand the full implications of what double taxation could mean to her, but she found it "alarming." Moore further advised petitioner of the existence of a tax treaty between France and the United States and suggested that she seek legal advice.

---

[7] As described more fully, *infra*, petitioner sold securities in 1976 and 1977, realizing significant capital gains. Most of the securities sold by petitioner were distributed to her upon the death of petitioner's mother. At the time of petitioner's meeting with Moore, petitioner's mother had not yet died.

[8] Petitioner's mother established the Sarah Campbell Blaffer Foundation to which she contributed many works of art and also funds so the foundation could add to its collection. The foundation operates a teaching art collection which is shown in schools throughout Texas. Petitioner is a trustee of the foundation.

## 1975 Distribution From the Testamentary Trust of Sarah Campbell Blaffer

Petitioner was one of four beneficiaries of the remainder of a complex testamentary trust (or trusts consisting of shares thereof) established under the will of her father, Robert L. Blaffer, designated as the Testamentary Trust of Sarah Campbell Blaffer (the testamentary trust). Petitioner's mother, Sarah Campbell Blaffer, who was the sole beneficiary of the testamentary trust during her lifetime, died on May 11, 1975. The will provided that upon Sarah Campbell Blaffer's death and certain stated conditions, the trust for each beneficiary was to terminate and such beneficiary was to receive her one-fourth share, outright, free, and clear of the trust. Petitioner met the conditions stated in her father's will and, upon her mother's death, became entitled to her share of the trust assets.

Texas Commerce Bank was the executor of Sarah Campbell Blaffer's estate, a very large estate. Included in the estate were many assets which required "quite a bit" of activity by the bank in connection with its administration. The sole surviving trustee of the testamentary trust was Mrs. Jane Owen, petitioner's sister. Mrs. Owen employed Texas Commerce Bank in an agency capacity to assist her in her duties as trustee of the testamentary trust to accomplish the transfer of some 39 different stocks to the beneficiaries of the testamentary trust.

James M. Barr (Barr), a Texas Commerce Bank trust officer, wrote to the various transfer agents for each of the 39 securities requesting the reissuance of the shares held by the testamentary trust in the names of the four beneficiaries of the trust. Most of the letters to the transfer agents are dated December 22, 1975; a few are dated later. The task of writing to the transfer agents was handled as a routine matter by the bank personnel involved.

Texas Commerce Bank was not requested to assist with the transfer of Exxon stock to the beneficiaries of the testamentary trust. Mrs. Ora V. Howton (Mrs. Howton), manager of Mrs. Blaffer's office, handled that particular transfer herself because she was proud of her connection with Exxon; she felt she was part of the Humble Oil family; and she knew the

personnel at the First National City Bank who did the transfer work with respect to the Exxon stock.

By letter dated November 18, 1975, Mrs. Owen sent 122,167 shares of Exxon Corp. stock, an asset of the testamentary trust, to Mr. George Grosz, a trust officer with the First National City Bank, the transfer agent for Exxon Corp. Mrs. Owen's letter includes instructions concerning the reissuance of the Exxon stock, requesting that 30,541 shares, i.e., one-fourth of the total shares, be reissued in petitioner's name. Pursuant to Mrs. Owen's request, the 30,541 shares of Exxon stock, having a total value of $2,653,249, were reissued in the name of petitioner on the books of Exxon's transfer agent on November 20, 1975.

Petitioner knew that after the death of her mother, she would be receiving distributions from the testamentary trust. During 1975 and 1976, petitioner had a close relationship with her sister, Mrs. Owen, the trustee of the testamentary trust, and would not have hesitated to ask her sister to assist her in any reasonable manner. Petitioner felt that her sister would have accommodated any reasonable request for her. Petitioner, however, did not give anyone, in particular her sister, Mrs. Owen, or the personnel at the Texas Commerce Bank, any instructions or make any requests with respect to the timing of any distributions from the testamentary trust.

Knowing that she was to receive distributions from the testamentary trust, indeed that "they had begun distributing it," and knowing that she would be out of the United States for an extended period when such distributions would be made, petitioner executed, on December 17, 1975, before she left for Europe after her honeymoon in the United States, a limited power of attorney (power of attorney) appointing her son, Joe Hudson, as her attorney-in-fact for the purpose of receiving petitioner's portion of the assets to be distributed from the testamentary trust. Petitioner also executed a partial receipt and release dated December 17, 1975 (partial receipt), in connection with the distribution to her of various assets, including 30,541 shares of Exxon stock, from the testamentary trust.

It has been stipulated that petitioner received distributions from the testamentary trust in 1975, before the date of her expatriation, in the amount of $995,724.76 consisting of an

accumulation distribution of $830,753.13 and $164,971.63 in distributable net income.

## *1975 Distribution From the Cecil A. Blaffer Trust No. 1*

On December 28, 1934, petitioner's parents established an inter vivos trust, the Cecil A. Blaffer Trust No. 1 (Trust No. 1), of which petitioner was the sole beneficiary. Trust No. 1 was a complex trust with a taxable year ending December 31. In 1975, Texas Commerce Bank was the trustee of Trust No. 1; Leslie C. Lewis (Lewis), a senior vice president and trust officer at Texas Commerce Bank, who had worked on the Blaffer family trust accounts since he returned to Texas Commerce Bank from World War II, was the trust officer in charge of the administration of Trust No. 1 in 1975.

With respect to distributions, section II of the Cecil Amelia Blaffer Trust Agreement, the governing instrument of Trust No. 1, provides as follows:

SECTION II. The principal and the income of the Trust Fund shall be held in trust for the benefit of my said daughter, CECIL AMELIA BLAFFER, until she attains sixty-five (65) years of age: PROVIDED, that when our said daughter becomes thirty (30) years of age, the Trustee shall pay over to her during *each year thereafter*, that fraction of the undistributed portion of the principal of the Trust Fund represented by the figure one over the number of years remaining until our said daughter attains the age of sixty-five (65) years. That is to say, when our said daughter becomes thirty (30) years of age, *during the first year thereafter* there shall be distributed to her one-thirty-fifth (1/35) of the undistributed portion of the principal of the Trust Fund; during the second year, one-thirty-fourth (1/34); etc., until the thirty-fifth year after our said daughter attains thirty (30) years of age is reached, when the remaining undistributed portion of the principal of the Trust Fund shall be distributed to our said daughter. The income of the Trust Fund shall be accumulated and added to the principal of the Trust Fund and distributed as a part thereof in accordance with the foregoing provisions: PROVIDED, That our said daughter during any calendar year after she attains legal age shall have the right to elect in writing to require the Trustee to distribute to her during the succeeding calendar year the income, in whole or in part, of the Trust Fund accruing during each succeeding calendar year; and the election of our said daughter as to the amount of such income to be distributed to her shall be binding in all respects upon the Trustee. *Said payments of principal and income* of the Trust Fund *shall be made quarterly* to our said daughter *on January 1st, April 1st, July 1st and October 1st, of the year in which they respectively become due.* [Emphasis added.]

Although section II, as recited above, provided for quarterly distributions to petitioner of the applicable fractional portion of principal in the year succeeding each birthday on which the fraction was calculated, Texas Commerce Bank's administrative practice, which was consistent with that which had been followed by the prior trustee of Trust No. 1, was to make a single annual distribution at some time following petitioner's birthday. Texas Commerce Bank's normal administrative practice was to calculate the book value of the assets of Trust No. 1 as of petitioner's birthday each year, and to apply the applicable fraction as provided in section II of the trust agreement in determining the amount to be distributed to the petitioner.

Distributions following petitioner's birthday for the years 1970 through 1976 were recorded on the bank's books as follows:

| Date distribution calculated | Date distribution recorded in Texas Commerce Bank records |
|---|---|
| Dec. 17, 1970 | Dec. 30, 1970 |
| Dec. 17, 1971 | Dec. 23, 1971 |
| Dec. 17, 1972 | Dec. 22, 1972 |
| Dec. 17, 1973 | Jan. 25, 1974 |
| Dec. 17, 1974 | Dec. 17, 1974 |
| Dec. 17, 1975 | Dec. 23, 1975 |
| Dec. 17, 1976 | Mar. 7, 1977 |

Each of the foregoing dates on which the respective distributions were recorded was probably the date on which the check for the distribution was written; the check, however, could have been recorded the day after it was written.

The distribution from Trust No. 1 with respect to petitioner's birthday on December 17, 1975, was made by Texas Commerce Bank in the amount of $128,792.71 by its check dated December 22, 1975. Lewis transmitted the check to petitioner with his letter dated December 22, 1975, addressed to petitioner in care of Mrs. Howton, manager of petitioner's mother's office. Lewis could not recall whether he hand-delivered this letter or put it in the mail. The check was deposited in petitioner's account on December 23, 1975.

Petitioner, herself, never communicated with Lewis concerning distributions from Trust No. 1; only Mrs. Howton communicated with Lewis with respect to such distributions.

Mrs. Howton, however, never communicated with Lewis concerning the timing of any distributions to petitioner from Trust No. 1.

Petitioner did no planning with respect to the 1975 distribution to her from Trust No. 1; nor did she do anything with respect to the timing of such distribution. She did not communicate to Texas Commerce Bank at any time prior to December 23, 1975, any information concerning her intention to adopt Austrian citizenship. During 1975, petitioner did not even know when the 1975 distribution from Trust No. 1 had been received for her account.

Lewis did not do, nor did he cause anyone else at Texas Commerce Bank to do, any planning with respect to the 1975 distribution to petitioner from Trust No. 1, other than to take the routine administrative steps which had been followed for a number of previous years. Indeed, Lewis was not aware of any action being taken with respect to the 1975 distribution which differed from the routine which had been followed in previous years. He knew of no particular reason for selecting December 22, 1975, as the date on which the distribution check was transmitted to petitioner.

Because Lewis had been the Texas Commerce Bank trust officer in charge of the Blaffer family accounts for many years prior to 1975, it would have been usual procedure for him to be informed of any matters affecting any of the Blaffer family accounts with the bank. On December 23, 1975, Lewis had no knowledge with respect to petitioner's intention to adopt Austrian citizenship.

*Sales of Securities by Petitioner in 1976 and 1977*

As of December 23, 1975, the date of her expatriation, petitioner had no intention of selling any securities. After her meeting with her accountant, Mr. Moore, in March 1976, petitioner understood that as a result of the distribution of securities and other assets to her from the testamentary trust which "considerably increased" her dividend income, she faced "dangerous exposure" to potential tax problems, particularly to the possibility of double taxation of her dividends by the United States and France. At some time after her March 1976 meeting with Mr. Moore, however, during 1976 and 1977, petitioner sold more stock than she had ever sold before.

In 1976, petitioner realized a net capital gain in the amount of $2,601,680.06 from the sale of securities. Many of the securities sold were those which had been distributed to petitioner from the testamentary trust. In 1977, petitioner again realized a net capital gain of $7,219,440.35 from the sale of various securities. The great bulk of this gain, $7,080,908.82, resulted from her sale of 148,742 shares of Exxon stock.

Petitioner delayed her sale of the Exxon stock until at least the summer of 1977 because she was "hesitant to part with it." She considered Exxon to be part of her "father's endeavor" and it was obviously sentimental to her. Petitioner's mother, during her lifetime, had always cautioned her children not to sell their Exxon stock.

### *Petitioner's Tax Returns: 1974—1977*

Petitioner filed income tax returns and reported income and tax liability for 1974 through 1977 as described below:

*1974.*—As a U.S. citizen for the entire year, petitioner filed a Form 1040 for 1974. She reported total income of $766,297.08, consisting principally of dividend income from various sources in the amount of $688,766.55. Her total U.S. tax liability for the year, computed under the graduated rates applicable to U.S. citizens, was $155,990.54.

*1975.*—For 1975, petitioner filed a Form 1040NR, U.S. Nonresident Alien Income Tax Return, attaching to it a Form 1040. Schedule 1 of the Form 1040NR is entitled "General Information" and states in relevant part:

Taxpayer was a resident of France during the entire year of 1975. She was a U.S. Citizen until December 23, 1975 on which date she acquired the nationality of Austria by naturalization.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Taxpayer's income tax liability for the period from January 1, 1975 to December 22, 1975 is computed on Form 1040 and supporting schedules attached.

Taxpayer's income during the period from December 23, 1975 to December 31, 1975 is reported on page 4 of Form 1040NR. The tax on dividends is computed at 15 percent in accordance with French Income Tax Treaty, Article 9, copy of which is attached.

Taxpayer received distributions in 1975 from the Testamentary Trust for Sarah C. Blaffer. Copies of Schedules K-1 and J are attached.

On the Form 1040 attached to the Form 1040NR, petitioner reported the following as income received prior to December 23, 1975, the date of her expatriation:

| | |
|---|---|
| Dividends (less $100 exclusion) | $644,659.19 |
| Interest | 2,570.99 |
| Capital gains (after sec. 1202 deduction) | 488.55 |
| Rental or royalty income (net) | 56,603.32 |
| Director fees | 1,200.00 |
| Prize | 1,000.00 |
| Total | 706,522.05 |

The tax on the income reported on the Form 1040 as received prior to December 23, 1975, was computed under the graduated tax rates applicable to U.S. citizens.

On the Form 1040NR, petitioner reported the following as income received during the period December 23, 1975, through December 31, 1975, after her expatriation:

*Dividends*

| | |
|---|---|
| Blue Creek Ranch | $812.50 |
| Murray Corp. | 499.80 |
| Wallace-Murray Pfd. | 30.60 |
| Cecil A. Blaffer Trust No. 1 | 128,793.00 |
| Testamentary Trust for Sarah Campbell Blaffer | 995,724.76 |
| | 1,125,860.66 |

*Oil and gas royalties*

| | |
|---|---|
| Exxon Corp | 5,932.37 |
| Amoco Production | 600.22 |
| Scurlock Oil & Gas | 59.63 |
| Miscellaneous | 2,785.05 |
| | 9,377.27 |

*Rent income*

| | |
|---|---|
| Beekman Gallery, Inc. | 28,000.00 |

The tax on the dividend income, including the income received by petitioner from the distributions from Trust No. 1 and the testamentary trust listed on the Form 1040NR was computed using the 15-percent rate applicable under article 9 of the Convention with the French Republic with Respect to Income and Property, July 28, 1967, 23 U.S.T. 20, T.I.A.S. 7270, effective January 1, 1967 (the French Tax Treaty), the income tax treaty between the United States and France. The tax on the remainder of petitioner's reported income was

computed at the flat 30-percent rate provided in section 871. Petitioner's total U.S. tax liability for 1975, as reported, was $341,998.

Petitioner did not file French income tax returns while she was a citizen of the United States. In reliance on the advice of her French accountants, she, likewise, did not file a French income tax return for the short period after her expatriation from December 23, 1975, through December 31, 1975. Petitioner did not pay any French income taxes on the 1975 trust distributions.

*1976 and 1977.*—Petitioner filed Forms 1040NR for 1976 and 1977, reporting income as follows:

|  | 1976 | 1977 |
| --- | --- | --- |
| Dividends | $842,898 | $591,388 |
| Royalties | 96,191 | 124,357 |
| Director fees | 200 | 200 |

Petitioner computed the U.S. tax with respect to this income under the applicable percentages set forth in the French Tax Treaty and section 871. During 1976, petitioner realized capital gains from the sale of various securities in the amount of $2,601,680. Under the provisions of article 12 of the French Tax Treaty, capital gains are not taxed. Accordingly, attached to the 1976 Form 1040NR is Schedule 4 entitled "Gross Income Exclusion" which states the following:

For the year ended December 31, 1976, taxpayer has excluded: * * * capital gains in the amount of $2,601,680 received from the sale of personal property not used in a trade or business, pursuant to Internal Revenue Code Section 871 and Article 12 of the U.S. - French Tax Treaty * * *

During 1977, petitioner realized capital gains, principally from the sale of her Exxon stock, in the amount of $7,225,295. As she did in her 1976 return, petitioner excluded the capital gains from income under article 12 of the French Tax Treaty. She attached to her 1977 Form 1040NR Schedule 4 entitled "Gross Income Exclusion" which states the following:

For the year ended December 31, 1977, taxpayer has excluded: * * * capital gains in the amount of $7,225,295 received from the sale of personal property not used in a trade or business, pursuant to Internal Revenue Code Section 871 and Article 12 of the U.S. - French Tax Treaty.

In 1976, petitioner's reported U.S. tax liability was $155,352; her French tax liability was $364,292. In 1977, petitioner's reported U.S. tax liability was $126,075; petitioner's French tax liability for the year was 1,628,897F.[9] Petitioner's 1975, 1976, and 1977 income tax returns were prepared by Arthur Young & Co., and she signed them as presented to her without question or change.

In the notice of deficiency, respondent determined that the principal purpose of petitioner's expatriation was the avoidance of U.S. income taxes, and relying upon section 877, determined the deficiencies set forth above by applying the graduated tax rates normally applicable to U.S. citizens with respect to petitioner's capital gains and U.S.-source income received after the date of her expatriation.

## OPINION

### 1. The Tax-Avoidance Issue

Petitioner, a U.S. citizen by birth, adopted Austrian citizenship on December 23, 1975, thereby losing her U.S. citizenship. The controversy at hand centers on the income tax consequences flowing from petitioner's expatriation.

Until December 23, 1975, the date of her expatriation, petitioner reported her income and paid U.S. income taxes based on the graduated tax rates applicable to all U.S. citizens. Thereafter, as an Austrian citizen residing in Paris, petitioner became a nonresident alien for U.S. tax purposes. She reported her U.S.-source income as a nonresident alien for the last week of 1975 (December 23 to 31) and for 1976 and 1977.[10] In her

---

[9]The only evidence in the record concerning petitioner's French tax liability for 1977 is her 1977 French tax return on which her tax liability was reported in French francs.

[10]Sec. 1.871–13(a), Income Tax Regs., requires that when an individual changes his status from U.S. citizen to nonresident alien during the taxable year, the individual is taxable as though his taxable year were composed of two separate periods.

During the first period of U.S. citizen status, the individual is taxable under the rules generally applicable to U.S. citizens, i.e., he is taxable on his worldwide income at the customary graduated tax rates. *Cook v. Tait*, 265 U.S. 47 (1924); *Filler v. Commissioner*, 74 T.C. 406, 410 (1980); sec. 1.1–1(b), Income Tax Regs.

During the second period of nonresident alien status, commencing on the date U.S. citizenship is renounced, the individual is taxable under the special rules applicable to nonresident aliens, i.e., in general, he is taxed either, under sec. 871, at a flat 30-percent rate only on gross income derived from sources within the United States or gross income which is effectively connected with the conduct of a trade or business within the United States, or, under sec. 894, at lower treaty rates, where applicable.

nonresident alien returns (Forms 1040NR) for the periods at issue, petitioner reported that, as a nonresident alien residing in France, she was taxable under section 871 and the French Tax Treaty as follows:

(1) She was subject to tax on her U.S.-source dividends and interest at the respective rates of 15 percent and 10 percent under articles 9 and 10 of the French Tax Treaty. Petitioner received substantial trust distributions in late 1975 which she reported on her 1975 nonresident alien return as dividends taxable at the 15-percent rate under the French Tax Treaty;

(2) She was subject to tax on her other items of U.S.-source income not covered by the treaty (royalties, rent, director fees) at the flat rate of 30 percent under section 871; and

(3) She was not subject to U.S. tax on her capital gains under article 12 of the French Tax Treaty.

Respondent contends that the loss of petitioner's citizenship had for one of its principal purposes the avoidance of U.S. taxes so as to subject petitioner's U.S. source income and capital gains to taxation under the graduated tax rates made applicable by section 877 to former U.S. citizens who expatriate for tax-avoidance purposes. Petitioner, in the first instance, urges us to resolve this factual issue in her favor by finding that tax avoidance was not one of her principal purposes in expatriating, thus finding her to be taxable as a nonresident alien under the more favorable rates prescribed by section 871 and the French Tax Treaty.[11]

Petitioner, however, raises an alternative legal issue as well. She contends that even were we to conclude that tax avoidance was one of her principal purposes in expatriating, she is, nevertheless, entitled, as a nonresident alien resident in France beginning December 23, 1975, to be taxed on her capital gains and U.S.-source dividends and interest under the

---

Sec. 1.6012–1(b)(2)(ii)(*b*), Income Tax Regs., provides that only one tax return should be filed for a dual status year with allocations reflected on a special schedule attached to the return; the proper form is determined by the status of the taxpayer at taxable yearend. Thus, for 1975, the year of her change in status, petitioner filed a Form 1040NR, a nonresident alien return.

See discussion, *infra*, in part 2, A, concerning the issue of whether a change in status creates 2 taxable years.

[11]Assuming that the principal purpose of her expatriation was not tax avoidance, the parties have stipulated to all of the conditions necessary for the application of arts. 9, 10, and 12 of the French Tax Treaty to petitioner's capital gains and U.S-source dividends and interest.

French Tax Treaty.[12] Petitioner contends that because the French Tax Treaty and section 877 are inconsistent with respect to the rates of U.S. tax applicable to her, it is the French Tax Treaty, adopted subsequent to section 877, which takes precedence.[13] Respondent, however, takes the position that under article 22(4)(a), the "savings clause" of the French Tax Treaty, the benefits of the treaty are not available to former U.S. citizens who have lost their U.S. citizenship for tax-avoidance purposes.[14] Because we resolve the factual issue in favor of petitioner, we find it unnecessary to decide the legal issue.

In general, section 877 provides that a nonresident alien individual who loses his U.S. citizenship shall be subject to tax on his U.S.-source income, for the 10-year period following such loss, at the graduated tax rates applicable to U.S. citizens rather than more favorable rates applicable to nonresident aliens, unless the loss of citizenship did not have for one of its principal purposes the avoidance of U.S. taxes.[15] See H. Rept.

---

[12]Petitioner concedes on this issue that should we find tax avoidance a principal purpose in her expatriation, the remainder of her U.S.-source income is taxable under sec. 877.

[13]Sec. 877 was added to the Internal Revenue Code of 1954 as amended, by H.R. 13103, 90th Cong., 1st Sess. (1966), the Foreign Investors Tax Act of 1966, Pub. L. 89–809, 80 Stat. 1541, signed into law by the President on Nov. 13, 1966.

The French Tax Treaty, 19 U.S.T. 5280, T.I.A.S. 6518, effective during the years at issue was signed July 28, 1967; the U.S. Senate gave its advice and consent to ratification of the treaty on June 6, 1968; it was brought into force by an exchange of instruments of ratification on July 11, 1968.

[14]During the years at issue, art. 22(4)(a) of the French Tax Treaty, known as the "savings clause," provided as follows:

"The United States may tax its citizens and residents as if the present Convention had not come into effect."

By a Protocol to the French Tax Treaty, 1979–2 C.B. 411, 413, T.I.A.S. 9500, signed Nov. 24, 1978, in force Oct. 27, 1979, by exchange of instruments of ratification and effective for tax years beginning on or after Jan. 1, 1979, the savings clause of the French Tax Treaty was changed to read as follows:

"The United States may tax its citizens and residents as if the present Convention had not come into effect. For this purpose the term "citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss."

Respondent contends, as detailed more fully in Rev. Rul. 79–152, 79–1 C.B. 237, that this change was a "clarifying change" only and that, even though the French Tax Treaty did not, during the years at issue, specifically reserve the right of the United States to tax under sec. 877, petitioner is nonetheless subject to tax under that section.

[15]SEC. 877. EXPATRIATION TO AVOID TAX.

(a) IN GENERAL.—Every nonresident alien individual who at any time after March 8, 1965, and within the 10-year period immediately preceding the close of the taxable year lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes

1450, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 967, 982; S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 1059, 1078. Section 877(e) specifically assigns the burden of proving the lack of a tax-avoidance motive on the expatriate if respondent establishes that it is reasonable to believe that the individual's loss of U.S. citizenship would result in a substantial reduction in taxes. The parties have stipulated that respondent has met his initial burden of proof under section 877(e). Thus, the burden is on petitioner to demonstrate that tax avoidance was not one of her principal purposes in expatriating. The issue is purely factual.

Although we have never specifically interpreted the phrase "one of its principal purposes" in the context of section 877, we find instructive the following definition set forth in *Dittler Bros., Inc. v. Commissioner*, 72 T.C. 896, 915 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981), in which the Court was called upon to determine, under section 367, whether or not a certain transaction was in "pursuance of

---

under this subtitle or subtitle B, shall be taxable for such taxable year in the manner provided in subsection (b) if the tax imposed pursuant to such subsection exceeds the tax which, without regard to this section, is imposed pursuant to section 871.

(b) ALTERNATIVE TAX.—A nonresident alien individual described in subsection (a) shall be taxable for the taxable year as provided in section 1, 55, or 402(e)(1), except that—

(1) the gross income shall include only the gross income described in section 872(a) (as modified by subsection (c) of this section), and

(2) the deductions shall be allowed if and to the extent that they are connected with the gross income included under this section, except that the capital loss carryover provided by section 1212(b) shall not be allowed; and the proper allocation and apportionment of the deductions for this purpose shall be determined as provided under regulations prescribed by the Secretary. For purposes of paragraph (2), the deductions allowed by section 873(b) shall be allowed; and the deduction (for losses not connected with the trade or business if incurred in transactions entered into for profit) allowed by section 165(c)(2) shall be allowed, but only if the profit, if such transaction had resulted in a profit, would be included in gross income under this section.

(c) SPECIAL RULES OF SOURCE.—For purposes of subsection (b), the following items of gross income shall be treated as income from sources within the United States:

(1) SALE OF PROPERTY.—Gains on the sale or exchange of property (other than stock or debt obligations) located in the Unites States.

(2) STOCK OR DEBT OBLIGATIONS.—Gains on the sale or exchange of stock issued by a domestic corporation or debt obligations of United States persons of the United States, a State or political subdivision thereof, or the District of Columbia.

(d) EXCEPTION FOR LOSS OF CITIZENSHIP FOR CERTAIN CAUSES.—Subsection (a) shall not apply to a nonresident alien individual whose loss of United States citizenship resulted from the application of section 301(b), 350, or 355 of the Immigration and Nationality Act, as amended (8 U.S.C. 1401(b), 1482, or 1487).

(e) BURDEN OF PROOF.—If the Secretary establishes that it is reasonable to believe that an individual's loss of United States citizenship would, but for this section, result in a substantial reduction for the taxable year in the taxes on his probable income for such year, the burden of proving for such taxable year that such loss of citizenship did not have for one of its principal purposes the avoidance of taxes under this subtitle or. subtitle B shall be on such individual.

a plan having as one of its principal purposes the avoidance of Federal income taxes:"

we believe that the term "principal purposes" should be construed in accordance with its ordinary meaning. Such a rule of statutory construction has been endorsed by the Supreme Court. *Malat v. Riddell*, 383 U.S. 569, 571 (1966). Webster's New Collegiate Dictionary defines "principal" as "first in rank, authority, importance, or degree." Thus, the proper inquiry hereunder is whether the exchange of manufacturing know-how was in pursuance of a plan having as one of its "first-in-importance" purposes the avoidance of Federal income taxes.

After careful consideration of all the evidence, we conclude that petitioner has carried her burden under section 877(e); we are convinced that petitioner did not have tax avoidance as one of her principal or "first in importance" purposes in expatriating.

With respect to her intent in expatriating, petitioner testified that: She and Furstenberg decided to marry in early 1975. At that time, Furstenberg, a titled Austrian aristrocrat, requested that petitioner adopt his Austrian citizenship. Although she had been living abroad for more than 7 years, petitioner had never before considered expatriation. Desiring, however, to do what she could to make her third marriage a success and cognizant of the fact that it was general European custom for a wife to adopt the nationality of her husband, petitioner committed herself at the time of her decision to marry Furstenberg in early 1975 to "bear his name, his title, and his nationality."

Petitioner's decision to expatriate at the time of her marriage was further motivated, as she testified, by her ever-increasing, lifelong ties to Europe; her preference for living in Europe rather than anywhere else; her personal and professional interest in the arts; the fact that, as of 1975, her social life was centered in Europe, where she had been living for more than 7 years; and the fact that both of her parents were dead and her children were grown. In sum, her expatriation was the result of both her commitment to marry Furstenberg and the ultimate culmination of her lifelong ties to Europe. Petitioner specifically declared that tax avoidance was neither a principal purpose, nor any purpose whatsoever, in her decision to adopt Austrian citizenship. We found petitioner to

be a straightforward and credible witness; we have no reason to disbelieve or doubt her testimony.

Respondent, citing cases dealing with determinations of fraud under section 6653(b), contends that intent, or the lack thereof, can seldom be established by direct proof and, therefore, urges us to examine petitioner's entire course of conduct to determine her intent in expatriating. It is true that in the context of a fraud determination, seldom will an individual be forthcoming with direct evidence of his fraudulent intent, and respondent, in order to carry his burden of proof, is often forced to present indirect evidence of the individual's conduct on which inferences as to fraudulent intent may be drawn. In this case, however, petitioner has the burden of proof, and she has squarely addressed the issue of her intent through her uncontroverted testimony. Moreover, an examination of petitioner's conduct with respect to her expatriation, in our view, only serves to corroborate her testimony concerning her lack of tax-avoidance motives.

Petitioner met with her accountant, Gordon Moore, in late April or early May 1975, only after her decision to marry Furstenberg and her commitment to adopt Austrian citizenship had been made. She asked him to advise her concerning the income tax consequences of her planned marriage and expatriation. At that time, he warned petitioner that her plan to marry and expatriate would "complicate" her taxes; that French taxes could be very bad and were getting worse. Petitioner had no further discussions with Moore until March 1976, after her expatriation, when he advised her of the risk of double taxation on her dividends by France and the United States.

Only after this second meeting with Moore, which occurred after her expatriation, did petitioner decide to sell the bulk of the securities that she received in the 1975 distribution from the testamentary trust. Sales of those securities resulted in substantial capital gains in 1976 and 1977. Indeed, she did not sell her Exxon stock, a valuable family asset, until 1977. That she sold her Exxon stock at all, against her mother's express advice, is striking evidence that petitioner's sales of securities stemmed from her concern with respect to double taxation on

her dividends after her expatriation rather than any preconceived plan of tax avoidance.[16]

The foregoing chronology of events makes clear that at the time of her expatriation, petitioner was aware not of any possible tax advantages, but only of possible negative tax consequences which could follow from giving up her U.S. citizenship. Petitioner's decision to sell her securities was made after her expatriation. Avoidance of taxes, therefore, could not have been a consideration either as of the date of her decision to expatriate or the date of expatriation, itself.

Further, rather than concluding that the timing of petitioner's expatriation points to her tax-avoidance motives, as urged by respondent, we think the timing of her expatriation is compelling evidence, itself, that petitioner's expatriation was inextricably linked only to her commitment to marry Furstenberg, rather than to any plan of tax avoidance. Petitioner expatriated on December 23, 1975, only 4 days following her return from her honeymoon and the day of her scheduled departure for a Christmas holiday in Italy. Had her expatriation not been tied to her marriage to Furstenberg, petitioner, who had been living in Europe for more than 7 years and in France for at least 5 years, could have expatriated years earlier. She could have, thereby, claimed the benefits of the French Tax Treaty years earlier.

In addition, knowing that she was eventually to receive sizable trust distributions, petitioner, were she as sophisticated a taxpayer as respondent would have us believe, could surely have coordinated the timing of her expatriation, viz-à-viz the trust distributions, more favorably. She could have expatriated before both trust distributions. Surely petitioner would not have given her son the power of attorney and receipt and release authorizing him to receive her trust distribution at any particular time. By the terms of Trust No. 1, she was legally entitled to quarterly distributions, beginning on January 1, 1976, after her December 17, 1975, birthday; yet she did nothing to cause the trustee to vary its administrative

---

[16]According to the testimony of a French tax law expert, if petitioner's dividend income were to be taxed by the United States under sec. 877, the aggregate marginal rate of tax on her dividends would be 115 percent, 70 percent to the United States and 45 percent to France. Because most of petitioner's income was derived from U.S. sources, her sec. 901 foreign tax credit would be minimal.

practice of distributing shortly after her December birthday the full amount to which she was entitled for the succeeding year. The timing of the November 1975 distribution from the testamentary trust was within the control of her sister as trustee; yet petitioner did nothing to delay the distribution so that it would be received in the taxable year after her expatriation was complete.

The timing of these trust distributions, which appear to have been made in the routine course of business, corroborates petitioner's testimony that she did no planning with respect to, and was not even aware of, the timing of the distributions. That she did no planning with respect to the trust distributions is evidence of her lack of tax-avoidance motives in giving up her U.S. citizenship. In our view, none of petitioner's actions, or her omissions to act, were done with tax avoidance as a first-in-importance purpose.

Petitioner's actions here are clearly distinguishable from those of Max Kronenberg, the taxpayer in *Kronenberg v. Commissioner*, 64 T.C. 428 (1975), the only other case in which the Court has decided the issue of tax avoidance as a principal purpose in expatriation under sec. 877. Kronenberg was a naturalized U.S. citizen who had retained his Swiss citizenship. From 1955 through 1966, Kronenberg owned 95.30 percent of the outstanding stock and was the president and co-director, with his wife, of PIC, Inc., a mica importing business. In 1966, Kronenberg decided to sell the business and considered moving back to Switzerland. On Feb. 26, 1966, PIC's shareholders voted to effect a complete liquidation under sec. 337 to be completed by Feb. 25, 1967. In December 1966, Kronenberg learned from his accountant that if he lost his U.S. citizenship prior to receiving the liquidating distribution from PIC, Inc., it would not be subject to tax by the United States. The Court described Kronenberg's subsequent activities as follows (64 T.C. at 434–435):

After learning of such tax advantage, he engaged in a flurry of activity: he engaged attorneys to prepare the papers and complete the liquidation of PIC; he sold the family house; he made all the necessary arrangements for the transportation of his family and possessions to Switzerland; on February 20, 1967, the shareholders and directors of PIC met and took the necessary actions to complete the liquidation of the corporation; he instructed his attorneys to distribute to him all the assets of PIC at the latest possible time; he and his family actually left the United States on February 21, 1967, and

arrived in Zurich on the following day; on February 23, 1967, he and his wife renounced their U.S. citizenship; and in accordance with his instructions, the transfer of funds from PIC to his personal account was carried out by his attorneys on February 24, 1967.

Finding Kronenberg's activities of January and February 1967 "too perfect to be unplanned" (64 T.C. at 435), the Court concluded that the evidence failed to show that Kronenberg gave any consideration to renouncing his U.S. citizenship before he learned of the tax advantages of doing so. The Court was "compelled" to find that Kronenberg had expatriated for tax-avoidance purposes.

In contrast, petitioner's activities were too imperfect from a tax standpoint to have been planned. As we have discussed, petitioner engaged in no "flurry of activity" in connection with her expatriation. She decided to expatriate before she knew anything about the tax consequences thereof; she had lived in Europe for more than 7 years; at the time of her expatriation she knew of only possible negative tax effects; and her activity, or lack of it, viz-à-viz the trust distributions indicates that she did no planning whatsoever to delay them until after her expatriation.

Respondent has offered no evidence to refute or impeach petitioner's testimony concerning her motives for expatriating. He urges us, however, to infer a tax-avoidance motive because petitioner never resided in Austria after adopting Austrian citizenship; because of the "fortunate" timing of her expatriation concommitant with the testamentary trust distribution of various securities, in 1976 and 1977, resulting in the realization of substantial capital gains which, but for her expatriation, enabled petitioner to reap significant tax benefits; and because petitioner is a wealthy, intelligent woman who in the past had relied on tax counsel.[17] This we decline to do.

First, we do not find as troubling, as does respondent, the fact that petitioner never resided in Austria after adopting Austrian citizenship. It merely corroborates petitioner's testi-

---

[17]We will not draw any negative inference against petitioner, as urged by respondent, as a result of petitioner's assertion of the attorney-client privilege in these proceedings. See 8 J. Wigmore, Evidence, sec. 2322, at 630 (1961): "If a client party claims the [attorney-client] privilege, the prevailing view * * * is that no inference should be drawn against him as to the unfavorable nature of the information sought."

mony that she adopted the Austrian citizenship of her husband as part of her marriage commitment, and reflects her belief that she was conforming to the custom of the European aristocracy which she was joining by her marriage. Petitioner testified that she was not adverse to living in Austria; indeed, she spent more than a month there in the summer of 1975, staying at Furstenberg's hunting lodge in Strobl. We think it quite reasonable, nonetheless, for petitioner and Furstenberg to have settled in Paris after their marriage. Furstenberg, who was 71 years old at the time of the marriage, had himself been living outside of Austria for many years, and he did not like living in Austria's harsh climate. Petitioner had lived in her Paris apartment for 5 years and was obviously settled into the social life there. That they chose to live in Paris rather than Austria, therefore, raises no suspicion of tax-avoidance motives.

Further, we draw no negative inference from the timing of the testamentary trust distribution in light of petitioner's uncontroverted testimony that at the time of her expatriation she had no intention of selling any of the securities distributed. The record is clear that only after her meeting with her accountant in March 1976, after her expatriation, did she decide to sell the securities out of her concern with respect to the possibility of double taxation of her dividends. Moreover, as we have discussed, had tax considerations played an important role in her decisions, she could have caused the trust distributions to have been more favorably timed.

Finally, although it is true that petitioner is a wealthy and intelligent woman, she has no more than a layman's knowledge of the tax law; indeed, she admitted that she did not read or understand her tax returns for the years at issue, she merely signed what was presented to her by her accountants. Thus, we cannot infer a tax-avoidance motive merely by virtue of her wealth and intelligence.

Petitioner, in this case, has had the burden of proving a negative, i.e., a lack of intent. Admittedly, this is usually a difficult thing to do. She testified that tax avoidance was not a purpose in her expatriation; her actions and the surrounding circumstances support her testimony. There is no evidence other than the magnitude of the deficiencies here in dispute to suggest otherwise. Although those deficiencies are sufficient to

place the burden of proof on petitioner under section 877(e), they are not enough to refute the direct credible testimony presented by petitioner and the corroborating facts and circumstances. We think petitioner has adequately met her burden of proving a lack of tax-avoidance motives. Thus, we conclude that because tax avoidance was not one of petitioner's principal purposes in expatriating, she is not taxable under section 877.

## 2. *Taxability of the 1975 Trust Distributions*

Having decided above that, after her expatriation, petitioner is not taxable under section 877, but rather, under section 871 and the French Tax Treaty, we turn to the alternative issues raised by respondent with respect to the proper tax rates applicable to the two trust distributions received by petitioner in 1975.

On November 20, 1975, petitioner received a distribution of $995,724.76 from the testamentary trust, a complex trust with a taxable year ending December 31, consisting of distributable net income in the amount of $164,971.63 and an accumulation distribution in the amount of $830,753.13. In December 1975, petitioner received a distribution consisting entirely of distributable net income in the amount of $128,792.71 from Trust No. 1, also a complex trust, with a taxable year ending December 31. Petitioner reported both trust distributions on her 1975 Form 1040NR as dividend income received after December 23, 1975, the date of her expatriation, and taxable at the flat rate of 15 percent under article 9 of the French Tax Treaty.

Respondent contends that petitioner was in actual receipt of the accumulation distribution from the testamentary trust and in constructive receipt of the distribution from Trust No. 1 before the date of her expatriation, and, therefore, both distributions are taxable at the graduated tax rates applicable to petitioner for the period of 1975 during which she was still a U.S. citizen.[18] We shall discuss the taxability of each of the trust distributions in turn.

---

[18]Petitioner was a U.S. citizen on Dec. 22, 1975, but became an alien for the entire day of Dec. 23, 1975, the date of her expatriation. Sec. 1.871–13(a)(2), Income Tax Regs; *Estate of Petschek v. Commissioner*, 81 T.C. 260, 264 (1983), affd. 738 F.2d 67 (2d Cir. 1984).

## A. The Testamentary Trust

The parties have stipulated that on November 20, 1975, before her expatriation, petitioner received a distribution from the testamentary trust, a portion of which was distributable net income and the balance was an accumulation distribution. Although she actually received the distribution before her expatriation, petitioner reported it on her 1975 Form 1040NR as taxable during the short period after she had become a nonresident alien. On brief, petitioner concedes that the portion of the distribution consisting of distributable net income ($164,971.63) is taxable at the graduated rates applicable to her while she was still a U.S. citizen. Petitioner maintains, however, that, regardless of the timing of the actual receipt, the accumulation distribution ($830,753.13) should, under sections 668(a) and 662(c), in the form in which they were then in effect, be includable in income during the period after which she lost her U.S. citizenship.

For the reasons stated below, we conclude that sections 668(a) and 662(c) do not require the result urged by petitioner; we sustain respondent's determination that the entire amount of the testamentary trust distribution is includable in income during the period before petitioner lost her U.S. citizenship and is thus taxable at the usual graduated rates.

Section 668(a), as in effect in 1975, provides that accumulation distributions from complex trusts "shall be included in the income of a beneficiary of the trust when paid."[19] Amplifi-

---

[19]SEC. 668. TREATMENT OF AMOUNTS DEEMED DISTRIBUTED IN PRECEDING YEARS.

(a) GENERAL RULE.—The total of the amounts which are treated under sections 666 and 669 as having been distributed by the trust in a preceding taxable year shall be included in the income of a beneficiary of the trust when paid, credited, or required to be distributed to the extent that such total would have been included in the income of such beneficiary under section 662(a)(2) and (b) if such total had been paid to such beneficiary on the last day of such preceding taxable year. * * *

Sec. 662(a), here referred to, is in pertinent part as follows:

SEC. 662. INCLUSION OF AMOUNTS IN GROSS INCOME OF BENEFICIARIES OF ESTATES AND TRUSTS ACCUMULATING INCOME OR DISTRIBUTING CORPUS.

(a) INCLUSION.—Subject to subsection (b), there shall be included in the gross income of a beneficiary to whom an amount specified in section 661(a) is paid, credited, or required to be distributed (by an estate or trust described in section 661), the sum of the following amounts:

(1) AMOUNTS REQUIRED TO BE DISTRIBUTED CURRENTLY.—The amount of income for the taxable year required to be distributed currently to such beneficiary, whether distributed or not. * * *

(2) OTHER AMOUNTS DISTRIBUTED.—All other amounts properly paid, credited, or required to be distributed to such beneficiary for the taxable year. If the sum of—

(A) the amount of income for the taxable year required to be distributed currently to all beneficiaries, and

cation of this statutory directive is found in section 1.668(a)–1A(a), Income Tax Regs., which provides that the total of an accumulation distribution is to be included in the income of the beneficiary in the taxable year of the beneficiary in which such amounts are in fact paid unless the taxable year of the beneficiary differs from the taxable year of the trust. In such a case, the regulation directs us to the rules under section 662(c), which provides that when a beneficiary has a taxable year different from that of the trust, an accumulation distribution is to be included in income in the tax year of the beneficiary which coincides with, or encompasses, the end of the tax year of the trust.[20] Petitioner contends that by virtue of her loss of U.S. citizenship, "a distinctive situation arose which required the operation of section 662(c)" with respect to the timing of inclusion of the accumulation distribution.

Petitioner argues that, because of her change in status from U.S. citizen to nonresident alien, she had 2 taxable years during 1975, the first covering her period of U.S. citizenship through December 22, and the second commencing December 23, the date of her expatriation, and ending December 31, covering the period during which she had become a nonresident alien. Petitioner's argument is based on the interaction of (1) section 1.871–13(a)(1), Income Tax Regs., which provides that when a taxpayer changes status from U.S. citizen to

---

(B) all other amounts properly paid, credited, or required to be distributed to all beneficiaries exceeds the distributable net income of the estate or trust, then, in lieu of the amount provided in the preceding sentence, there shall be included in the gross income of the beneficiary an amount which bears the same ratio to distributable net income (reduced by the amounts specified in (A)) as the other amounts properly paid, credited or required to be distributed to the beneficiary bear to the other amounts properly paid, credited, or required to be distributed to all beneficiaries.

[20]SEC. 662. INCLUSION OF AMOUNTS IN GROSS INCOME OF BENEFICIARIES OF ESTATES AND TRUSTS ACCUMULATING INCOME OR DISTRIBUTING CORPUS.

(c) DIFFERENT TAXABLE YEARS.—If the taxable year of a beneficiary is different from that of the estate or trust, the amount to be included in the gross income of the beneficiary shall be based on the distributable net income of the estate or trust and the amounts properly paid, credited, or required to be distributed to the beneficiary during any taxable year or years of the estate or trust ending within or with his taxable year.

The implementing regulation provides in part:

Sec. 1.662(c)–1. Different taxable years.

If a beneficiary has a different taxable year (as defined in section 441 or 442) from the taxable year of an estate or trust, the amount he is required to include in gross income in accordance with section 662(a) and (b) is based upon the distributable net income of the estate or trust and the amounts properly paid, credited, or required to be distributed to the beneficiary for any taxable year or years of the estate or trust ending with or within his taxable year. * * *

nonresident alien during the taxable year, he is taxable for such year "as though his taxable year were comprised of two separate periods," the first covering income received as a U.S. citizen and the second covering income received as a nonresident alien; (2) section 1.662(c)–1, Income Tax Regs., which provides that section 662(c) "applies as to so-called short taxable years as well as taxable years of normal duration"; and (3) section 441(b)(3) which defines the term "taxable year" as "the period for which the return is made, if a return is made for a period of less than 12 months." She maintains that, because section 441(b)(3) defines "taxable year" in terms of "periods," sec. 1.871–13(a)(1), Income Tax Regs., which divides the taxable year into "periods," sanctions the existence of 2 taxable years in a change-of-status calendar year.

Petitioner thus argues, because she had 2 taxable years in 1975 which were different from those of the testamentary trust, section 662(c) requires the inclusion of the accumulation distribution in her taxable income during her short, nonresident-alien-status taxable year, the end of which coincides with the end of the trust's taxable year. In effect, petitioner seeks to have us equate the notion of a "taxable period" with that of a short "taxable year."

We agree with respondent that petitioner's position calls for a misapplication of section 1.871–13(a)(1), Income Tax Regs., and section 441(b)(3). Petitioner's argument fails because, although her change-of-status year is bifurcated with respect to the tax rates applicable to income received during the period of citizenship versus nonresident alien status, her taxable year remains a single calendar year taxable year; her change of status does not create a short taxable year within the definition of section 443(b)(3). Because petitioner and the testamentary trust both have the same taxable year, section 662(c) is, by its terms, inapplicable to petitioner.

Section 1.871–13(a)(1), Income Tax Regs., directs a status-changing taxpayer to treat his taxable year "as though" it were "comprised of two separate periods."[21] By its express

---

[21]Sec. 1.871–13. Taxation of individuals for taxable year of change of U.S. citizenship or residence.

(a) *In general.* (1) An individual who is a citizen or resident of the United States at the beginning of the taxable year but a nonresident alien at the end of the taxable year, or a nonresident alien at the beginning of the taxable year but a citizen or resident of the United States at the end of the taxable year, is taxable for such year as though his taxable year were comprised of two separate

terms, the regulation provides that a status-changing taxpayer will have only 1 taxable year, albeit one which is divided into two portions, each taxable at different rates. Consistent with the notion that only a single taxable year is involved in a change-in-status situation, sec. 1.6012–1(b)(2)(ii), Income Tax Regs., provides that only one tax return should be filed for a dual status year, the proper form of which is determined by the status of the taxpayer at the taxable yearend, with allocations between the two periods reflected on a separate schedule attached to the return.[22] In compliance with this regulation, petitioner, herself, filed only one tax return for 1975, a Form 1040NR, attaching the required schedule of income allocations between the two periods.

We do not think that the definition of the term "taxable year" in section 441(b)(3) in any way transforms the two periods described in section 1.871–13(a)(1), Income Tax Regs., into two separate taxable years. Under section 441(b)(3), a period of less than 12 months is defined as a taxable year only if a return is made for a period of less than 12 months.[23] Sec. 1.441–1(b)(iii), Income Tax Regs., further directs that a return for a period of less than 12 months must be made under the provisions of section 443. As it then stood, section 443(a) authorized such "short period" returns under only three specific circumstances: (1) When a taxpayer changes his annual accounting period; (2) when a taxpayer is not in existence for an entire taxable year; and (3) when the Secretary terminates a taxpayer's taxable year for jeopardy. Petitioner has not argued, nor could she, that her circumstances conform to those specified in section 443; in fact, as stated above, she filed a single return for a 12-month calendar year. Section 441(b)(3) is, thus, inapplicable to her 1975 return.

periods, one consisting of the time during which he is a citizen or resident of the United States and the other consisting of the time during which he is not a citizen or resident of the United States. * * *

[22]This regulation embodies respondent's longstanding policy of requiring only one return for a dual status taxpayer dating back to G.C.M. 10759, XI–2 C.B. 99 (1932).

[23]SEC. 441. PERIOD FOR COMPUTATION OF TAXABLE INCOME.

(b) TAXABLE YEAR.—For purposes of this subtitle, the term "taxable year" means—

\* \* \* \* \* \* \*

(3) the period for which the return is made, if a return is made for a period of less than 12 months; * * *

Our conclusion that a status-changing taxpayer has only a single taxable year in the year of change finds support in the reasoning of *Estate of Petschek v. Commissioner*, 81 T.C. 260 (1983), affd. 738 F.2d 67 (2d Cir. 1984). Petschek, a calendar year taxpayer, was the income beneficiary of a simple trust, which also reported its income on a calendar year basis. During 1975, the year at issue, Petschek was a U.S. citizen until November 23, 1975, when he became a citizen of France. The issue was whether distributions from the trust should be taxed at the rates applicable to U.S. citizens or to nonresident aliens.

This Court observed in *Estate of Petschek v. Commissioner*, 81 T.C. at 264 n. 6, that the two periods prescribed in the case of status-changing taxpayers by sec. 1.871–13(a)(1), Income Tax Regs., "are not separate taxable years." Further, in addressing Petschek's argument under section 652(c), which, as does section 662(c) in the case of complex trusts, prescribes the timing of inclusion in income of distributions from simple trusts when the beneficiary and the trust have different taxable years, the Court noted: "The case before us does not involve such different taxable years." 81 T.C. at 270.[24] In affirming this Court's opinion on this point, the Court of Appeals (738 F.2d at 72) explained that "the operation of section 652(c) presupposes the continuation of the beneficiary's and the trust's respective taxpayer statuses from year to year," and stated that "Petschek's tax year did not end with his abandonment of his citizenship." With respect to the issue of whether a change in status creates 2 taxable years for a dual-status taxpayer, we see nothing to distinguish the facts of the instant situation from those of *Estate of Petschek*, even though we are here dealing with a complex trust. Thus, as section 652(c) was inapplicable to *Estate of Petschek*, so, too, is section 662(c) inapplicable to petitioner.

Having so decided, however, the issue remains as to the proper period for inclusion of the accumulation distribution under sec. 1.871–13(a)(1), Income Tax Regs., given the practical

---

[24]See also *Nico v. Commissioner*, 565 F.2d 1234, 1236 (2d Cir. 1977), affg. in part and revg. in part 67 T.C. 647 (1977); *More v. Commissioner*, 66 T.C. 27 (1976), affd. without published opinion 562 F.2d 38 (2d Cir. 1977); *Simenon v. Commissioner*, 44 T.C. 820, 832–833 (1965); *Klaas v. Commissioner*, 36 T.C. 239 (1961). These cases all hold, in the context of various Code sections, that a change in status does not provide a dual-status taxpayer with a short taxable year.

reality that, in the usual case, the amount of an accumulation distribution is calculated as of the end of the trust year. In *Estate of Petschek*, we rejected the taxpayer's argument that because distributable net income from a simple trust is calculated at the end of the trust's taxable year, such amount may only be included in the income of the beneficiary on the last day of the taxable year. There, we held that a beneficiary of a simple trust, i.e., one which is required to distribute all income currently, earns income simultaneously with the trust's realization of income, and, therefore, he must include in his own income for the period while he was still a U.S. citizen all of the income earned by the trust during the period, regardless of whether it had yet been distributed to him. In *Estate of Petschek*, however, we declined to decide how distributions from a complex trust, which could include income accumulated over a period of years, would be taxed. The statutory scheme governing complex trust distributions makes no special provision for the unique considerations involving change-in-status taxpayers; thus, the statute does not provide us with specific guidance on this issue.

Petitioner is correct in her assertion that the conduit rationale underlying our *Estate of Petschek* decision, based as it is on legal principles governing only simple trusts, may be inapplicable to an accumulation distribution from a complex trust. Such a distribution represents amounts that were earned by the trust in prior years and taxed at trust rates usually lower than rates applicable to the beneficiary's income. Such amounts, therefore, are not earned by the beneficiary simultaneously with the trust. We do not agree, however, that the reasoning of *Estate of Petschek* is wholly irrelevant to the issue before us. *Estate of Petschek*, as well as other cases cited by respondent, supports our conclusion that the taxpayer of change-of-status taxpayers is not always to be governed by the automatic application of the "usual" rules.[25]

---

[25]Illustrative of this principle are *Marsman v. Commissioner*, 205 F.2d 335 (4th Cir. 1953), affg. in part and revg. and remanding in part 18 T.C. 1 (1952), and *Gutierrez v. Commissioner*, 53 T.C. 394 (1969), affd. per curiam without published opinion (D.C. Cir. 1971). In those cases it was held, in spite of the unambiguous statutory directive under sec. 551(b) and its predecessor sec. 337(b), I.R.C. 1939, that the full amount of a deemed dividend from a foreign personal holding company is to be included in the shareholder's income as of the last day of the year, that only a pro rata portion of the dividend should be taxed to the taxpayers therein reflecting the fact that they had only been resident aliens for the last portion of the year, and subject to U.S. tax for only such portion.

On the facts of this case, because the accumulation distribution was actually received by petitioner and available for her use and benefit before her expatriation, we think it is includable in her income for the period in 1975 during which she was a U.S. citizen and thus taxable at graduated U.S. tax rates. This conclusion is consistent with both the literal terms of section 668(a) which directs inclusion of an accumulation distribution in the income of a beneficiary "when paid," and the directive of section 666(a)[26] that the amount of the accumulation distribution shall be deemed to be an amount "distributed on the last day of each of the preceding taxable years" for which the undistributed income was accumulated. These provisions indicate that consideration of the beneficiary's status both at the time of distribution and during the years of income accumulation is relevant in determining the tax consequences of an accumulation distribution to a status-changing taxpayer.[27]

Under the circumstances of this case, because petitioner was a U.S. citizen both during the years of accumulation and at the time of distribution, we think section 668 calls for the tax to be applied to such distribution at rates applicable to U.S. citizens. Certainly, to do so is consistent with the general policy underlying the taxation of accumulation distributions under the "throwback rules" of section 666, i.e., to eliminate tax avoidance by ensuring that a trust beneficiary pays tax at the rates applicable to him on the trust distributions he receives, rather than allowing him, by income accumulation, to shift the tax burden to the trust which is subject, generally, to lower tax rates. See H. Rept. 1337, 83d Cong., 2d Sess. 60–64 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 84–85 (1954).

Admittedly, our conclusion is made easier by the fact that the amounts of distributable net income and accumulated income stipulated by the parties as having been received by

---

[26]SEC. 666. ACCUMULATION DISTRIBUTION ALLOCATED TO PRECEDING YEARS.

(a) AMOUNT ALLOCATED.—In the case of a trust which is subject to subpart C, the amount of the accumulation distribution of such trust for a taxable year shall be deemed to be an amount within the meaning of paragraph (2) of section 661(a) distributed on the last day of each of the preceding taxable years, commencing with the earliest of such years, to the extent that such amount exceeds the total of any undistributed net income for all earlier preceding taxable years. The amount deemed to be distributed in any such preceding taxable year under the preceding sentence shall not exceed the undistributed net income for such preceding taxable year. * * *

[27]We need not here decide what the result would have been had petitioner received the accumulation distribution after her expatriation.

petitioner before her expatriation constitute the entire year's trust income as revealed by the 1975 Form 1041 fiduciary return for the testamentary trust. There is, therefore, no problem in allocating current earnings during 1975 between petitioner's citizen and nonresident alien periods. Such accounting problems need not be addressed here. We emphasize that we are not announcing a hard and fast rule with respect to the timing of income inclusion of an accumulation distribution by a change-of-status taxpayer. On the facts of this case, however, we think the accumulation distribution is includable in petitioner's income for the period during which she was a U.S. citizen.

## B. *Trust No. 1*

On December 17, 1975, petitioner attained the age of 56 years, and under the terms of section II of the instrument governing Trust No. 1, she became entitled to receive a distribution of one-ninth of the principal of the trust. Although the trust instrument provided that payment of the distribution calculated as of December 17, 1975, was to be made in quarterly installments beginning on January 1, 1976, the year following petitioner's 1975 birthday, the trustee, Texas Commerce Bank, had for years followed the administrative practice of calculating the amount of each year's distribution as of December 17, the petitioner's birthday, and paying the entire amount of that year's distribution in a single annual payment on some date following petitioner's birthday, often, but not always in the same year on which the calculated amount was based.

With respect to the 1975 distribution at issue, the facts, undisputed by the parties, are as follows: The amount of the distribution was calculated based on the value of the trust assets as of December 17, 1975, petitioner's birthday. Petitioner returned to Europe on December 19, 1975. The trustee's check for the distribution was written on December 22, 1975, and recorded on the trustee's books on December 23, 1975. The check was deposited into petitioner's account on December 23, 1975. The trust officer in charge of Trust No. 1 could not remember whether he personally delivered the check to petitioner's family office on December 22, or whether he placed it in the mail.

There is no evidence that petitioner or her agent actually received the check before December 23, 1975, the date it was deposited in petitioner's account.[28] Thus, the issue is whether she constructively received the income before that date.[29] This issue was raised by respondent for the first time in his Answer and Answer to Amended Petition; the issue is, therefore, a new matter with respect to which respondent has the burden of proof. Rule 142(a); *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981); *Estate of Falese v. Commissioner*, 58 T.C. 895, 898–899 (1972). Our study of the evidence on this issue leads us to conclude that respondent has failed to meet his burden; on the evidence before us, we are unable to find that petitioner was in constructive receipt of the distribution from Trust No. 1 before December 23, 1975.

The doctrine of constructive receipt is based on the principle that income is received by cash method taxpayers "when it is made subject to the will and control of the taxpayer and can be, except for his own action or inaction, reduced to actual possession." *Loose v. United States*, 74 F.2d 147, 150 (8th Cir. 1934). The general rule with respect to the inclusion of income under the doctrine of constructive receipt is set forth in section 1.451–2(a), Income Tax Regs., as follows:

Sec. 1.451–2. Constructive receipt of income.

(a) *General rule*. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Respondent bases his contention that petitioner was in constructive receipt of the distribution before her expatriation

---

[28]It is well settled that a cash method taxpayer is in receipt of income as of the date a check is received, whether or not such check is presented to a bank for payment. *Kahler v. Commissioner*, 18 T.C. 31, 34–35 (1952). Thus, had petitioner or her agent received the distribution check on Dec. 22, 1975, the distribution would have been taxable at the graduated rates. The evidence, however, does not prove when petitioner or her agent actually received the check.

[29]The Trust No. 1 instrument was executed on Dec. 28, 1934. The application to it of subsequent changes in the tax laws raises difficult potential issues. From the outset, the parties have limited their arguments with respect to this issue to whether or not the 1975 distribution was constructively received by petitioner prior to her expatriation. We do not know what evidence or arguments would have been presented had respondent taken a broader position. Accordingly, we decide only the issue presented by the parties.

on the following evidence: The amount of the distribution was calculated by the trustee "as of" December 17, 1975; the check was written on December 22, 1975; according to Lewis, the trust officer responsible for the administration of Trust No. 1, petitioner or her agent could have picked up the check the day it was written; further, according to Lewis, had petitioner so requested, he could have made the distribution as early as December 19, 1975. These facts, argues respondent, demonstrate that the distribution was made available to petitioner so that she could have drawn upon it before her expatriation, if notice of her intention to withdraw had been given.

We do not think that the evidence on which respondent relies is sufficient to demonstrate constructive receipt in this case. Implicit in the notion of availability to the taxpayer is notice to him that the funds are subject to his will and control.[30] Respondent has failed to show that either petitioner or her agent was informed or knew that the distribution check could have been picked up on December 22, 1975, or that they could have requested an earlier distribution.

Our findings reveal that the yearly distributions from 1970 through 1976 were not made on any specific date; in only 2 of the 7 years, 1972 and 1974, was the distribution recorded before December 23; in 2 years, 1971 and 1975, it was recorded on that date. Thus, petitioner could have had no expectation that she would receive the check before her expatriation. Petitioner, in fact, never communicated with the trustee with respect to any of the yearly trust distributions. It is true that petitioner's agent, Mrs. Howton, did, from time to time, communicate with the trustee concerning distributions from Trust No. 1; however, there is no evidence that Mrs. Howton ever communicated with the trustee with respect to the timing of such distributions, or that she had any knowledge that she could influence the timing.

This is clearly not a case in which petitioner "turned her back" on the income by taking any affirmative steps to delay receipt of the check until after her expatriation. Compare *Romine v. Commissioner*, 25 T.C. 859, 873–875 (1956). As discussed in part 1, above, petitioner did no planning whatsoever with respect to the Trust No. 1 distribution. Mindful of

---

[30] *Davis v. Commissioner*, T.C. Memo. 1978–12.

the oft-stated principle that constructive receipt should be sparingly applied (*Kaw Dehydrating Co. v. Commissioner*, 74 T.C. 370, 375 (1980); *Gullett v. Commissioner*, 31 B.T.A. 1067, 1069 (1935)), we do not think petitioner can be charged with constructive receipt of the trust distribution based on speculation concerning whether the trustee would have agreed to an earlier payment if so requested.[31] See *Amend v. Commissioner*, 13 T.C. 178, 184–185 (1949).

Thus, we conclude that petitioner was not in constructive receipt before her expatriation of the distribution from Trust No. 1 and that she properly reported the distribution as received during the period of 1975 in which she was a nonresident alien. The distribution from Trust No. 1 is taxable as reported by petitioner.

Based on the foregoing,

*Decision will be entered under Rule 155.*

---

[31] See Rev. Rul. 60–31, 1961–1 C.B. 174, 178, which states, among other things, that "the statute cannot be administered by speculating whether the payor would have been willing to agree to an earlier payment."

